**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**www.flsb.uscourts.gov**

In re:                                             **CASE NO. 13-11484-RAM**
                                                   **CHAPTER 11**
**MICHAEL GLYN BROWN,**

Debtor.

---

**EXPEDITED MOTION TO TRANSFER VENUE OF CASE TO THE UNITED STATES**
**BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS**

**The Movants Herein Respectfully Request This Matter be Set For Hearing on February 6,**
**2013 at 9:30 a.m. as There Are Other Matters Set For Hearing At That Time.**

Creditors, Steven A. Barrett, DPM, Stephen Barrett, as representative of Stephen Barrett,

DPM, P.A., Stephen Barrett, DPM, Austin, P.A., Stephen Barrett, DPM, DFW, P.A., Stephen

Barrett, DPM, San Antonio, P.A., and Barrett Foot and Ankle, P.C. (the "Barrett Creditors"),

Manuel Guyot ("Guyot"), Charles "Ed" Singleton, DPM ("Singleton") and Paul V. Ledesma,

DPM ("Ledesma") (all of whom referred herein as the "Texas Litigation Creditors"), by and

through undersigned counsel, respectfully request this Court transfer venue in this case to the

United States Bankruptcy Court for the Southern District of Texas, based both on the fact that,

upon information and belief, venue is improper in this case and, alternatively, if venue is proper,

pursuant to the discretionary transfer of venue statute found at 28 U.S.C. § 1412. As grounds in

support thereof respectfully state as follows:

**INTRODUCTION**

The Texas Litigation Creditors have lawsuits pending in the District Court of the 333rd

Judicial District, Harris County, Texas against the Debtor. The claims of the Barrett Creditors,

Singleton and Ledesma include claims for breaches of numerous fiduciary duties the Debtor had

to them, breach of contract against other entities related to the Debtor, and related claims. The

Debtor then named Guyot in a third party petition, to which Guyot asserted counterclaims for similar claims that the Barrett Creditors had raised. The Barrett Creditors' complaint has been pending for approximately a year and trial on the entire matter is set for September 2013.

The Court has already received some flavor of the case from the motion for relief from the automatic stay that the Debtor's wife, Rachel Brown, with whom the Debtor is involved in divorce proceedings that are also pending in Texas, filed in this case. Rather than "face the music" in Texas, it appears that the Debtor has fraudulently attempted to establish himself as a Florida resident and/or domiciliary in order to now file bankruptcy in Florida and force the numerous creditors chasing him, including the Texas Litigation Creditors  and his estranged spouse, to come to Florida and fight their fight. The Court should not condone this tactic. For beginners, as Rachel Brown noted in her motion for contempt filed in her divorce case and attached to her emergency motion for stay relief, the Debtor's purchases of real property in the State of Florida violated court orders entered in Texas. Thus, the Debtor had no legal right to acquire property in Florida  because he had been prohibited from doing so.

Second, even if the Debtor could somehow establish a right to move to Florida, it does not appear that the Debtor resided in or has ever established a residency in Florida. Rather, it appears that the Debtor, notwithstanding his ties to Houston, his multiple business interests there and his ongoing litigation there, has traveled the country and has not permanently resided in any one place for any significant amount of time. Rachel Brown's motion notes that the Debtor has spent time in New York and has rented property in Clearwater, Florida, this bringing into question whether he has ever resided within the Southern District of Florida and, if he has, whether or not he has resided there for the requisite amount of time to establish venue. Besides spending time in Clearwater and New York City, the Debtor has nonetheless spent significant time, even after he allegedly purchased property in Florida, residing at the Four Seasons Hotel in

Houston, Texas. Thus, it does not appear that the Debtor can establish that he either has become a domiciliary of Florida, because he has not established any long-term intent to stay here, or that he was a resident of Florida for the requisite 91 days prior to filing his Petition.

Even if, however, venue is technically proper in this district, the Court should nonetheless transfer venue to the Southern District of Texas because the majority of the factors set forth in Judge Williamson's opinion in *In re Newport Creamery, Inc*., 265 B.R. 614 (Bankr. M.D. Fla. 2001), which relied on the opinion of the Court of Appeals for the Fifth Circuit in *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239 (5th Cir. 1979), apply here. The vast majority of the Debtor's assets are still located in Texas. The vast majority of the Debtor's creditors are located in Texas, and the few that are not are located outside of Florida. Although the Debtor may technically be closer to this Court, at least on occasion, than to Houston, the Court should not condone the Debtor's fraudulent attempts at disenfranchising his creditors by allowing him to continue his scheme and use the bankruptcy process as a sword against his creditors, who are now located a great distance from this Court. The economic administration of the estate is best served by transferring the case because the majority of assets, including the company that generates most of the Debtor's income, are in Texas. Moreover, because much of the property is located in Texas and may or may not be considered community property under Texas law, the administration of the case by professionals in Texas who are readily familiar with community property law, any professionals would surely be more economical and efficient than keeping the case in Florida, where there is no community property law. Finally, it is readily apparent that there will be need for a trustee in this case. The Debtor appears to have been dissipating assets in an intentionally reckless fashion and violation of court orders and does not appear to be capable of operating as a debtor-in-possession. A trustee in Texas will be familiar with the manner in which Texas community property is liquidated, how the claims of creditors are applied to

3

community property, which is a familiarity that, respectfully, this Court and the local professionals generally do not have. Accordingly, the majority of the factors favoring the transfer of venue are present, assuming venue is proper in this district to begin with, and the Texas Litigation Creditors thus request the Court transfer venue to Houston.

## PROCEDURAL AND FACTUAL BACKGROUND AND ARGUMENTS IN SUPPORT OF TRANSFER

1.      The Debtor filed his Petition on or about January 23, 2013 (the "Petition Date"). The Debtor did not include the Schedules or Statement of Financial Affairs, or any other of the documents, but instead filed simply a "bare bones" Petition. The Debtor did, however, include a list of the Debtor's 20 largest creditors, although there were not 20 creditors on the list. The list did not include  the Texas Litigation Creditors.

2.      Without the Debtor's Schedules, it is difficult, if not impossible, to determine where exactly the Debtor is a resident or is domiciled, or where his principal assets are. However, upon information and belief, and based on what the Texas Litigation Creditors are aware of at this time, the Texas Litigation Creditors do not believe that the Debtor is either a resident or domicile of Florida, and further believe that most of his assets are located in Texas (including his substantial interests in numerous Texas-based corporations), notwithstanding that he appears to have attempted to bought real and/or personal property in Florida.

3.      On his Petition, the Debtor listed a street address for 101 20th Street, Apt. 3809, Miami Beach, Florida and a mailing address of 1001 Brickell Bay Drive, No. 2600, Miami, Florida. However, upon information and belief, the Debtor has continued to reside and been a domicile of Texas notwithstanding the statements on his Petition regarding the Debtor's address.

4.      The Texas Litigation Creditors are persons who were in business with the Debtor. In the interest of brevity, the history between the Texas Litigation Creditors and Debtor is not

4

**SLATKIN & REYNOLDS, P.A.**
One East Broward Boulevard, Suite 609, Fort Lauderdale, Florida 33301 Telephone 954.745.5880

repeated here. However, the Barrett Creditors have attached their Fourth Amended Petition hereto as Exhibit "1" and refer the Court to same for a much more detailed background of the claims they assert. In sum, the Debtor is a former doctor who has had his licenses to practice suspended and/or revoked in every jurisdiction where he was previously licensed. Nonetheless, the Debtor continues to run certain medical practices, for which he had an agreement to manage with the various doctors who performed surgeries in the Debtor's facilities. The allegations in the Fourth Amended Petition are essentially that the Debtor breached fiduciary duties to and/or defrauded the Barrett Creditors and Guyot and that the Debtor is liable for, at a minimum, $17 million in damages to them.

5.      As set forth in the Barrett Creditors' Fourth Amended Petition, the Debtor is an owner, officer, director, shareholder, member or otherwise holds or owns some controlling interest in the following companies: BHCF, LLC, which is a Texas limited liability company with its principal place of business in Harris County, Texas; Brown Medical Center, Inc. f/k/a Surgeons Management, Inc. ("SMI"), which is a Texas corporation with its principal place of business in Harris County, Texas; MG Brown Investment Group, LLC, a Texas limited liability company; and M.G. Brown International, LLC, a Texas limited liability company.

6.      The Debtor also owns a home at 9110 Memorial Drive, Houston, Texas, which is, upon information and belief, where the Debtor resided for many years prior to his separation from his wife. It is also the property where his wife is currently residing under temporary orders

issued by the family court.[1] The Debtor has also lived at the Four Seasons Hotel located at 1300 Lamar Street, Houston, Texas for long periods of time. It is not known exactly when or why the Debtor was living at the Four Seasons, although it may have to do with his ongoing divorce proceedings that are pending in Texas and the fact that he needed to be in Texas to run his businesses and otherwise look after his assets. In addition to his residence, the Debtor owns several other properties in Texas, one of which, a property located at 706 Buckingham, Houston, Texas, that is referred to in Rachel Brown's motion for stay relief. The Texas Litigation Creditors also believe the Debtor owns a ranch in Leon County, Texas (near Houston) and may own several parcels adjacent to or nearby the 9110 Memorial Drive home.

7.    Of primary concern is SMI. SMI is the business through which it is believed the Debtor earns most of his income. Upon information and belief, SMI currently has outstanding receivables of close to $50 million. SMI continues to operate and generate revenue, which, if the business was properly operated, would provide income to the Debtor after all the doctors and

---

[1]    This property is also the Debtor's homestead as defined under Texas law. The Debtor designated the property as his homestead by obtaining a homestead exemption through the Harris County Tax Appraisal District. *See* TEX. PROP. CODE ANN. § 41.005(e) (West 2000) (specifying procedure for designating a homestead through the county appraisal district). In the case of a husband and wife, both spouses enjoy the homestead rights conferred by the Texas Constitution as soon as the property acquires its homestead character and whether or not the homestead is one spouse's separate property or is community property. *Gonzales v. Gonzales*, 273 S.W. 798, 798 (Tex. 1925). A spouse acting without the consent of the other spouse cannot encumber or transfer the homestead. TEX. FAM. CODE ANN. § 5.001 (West 2006); *see also Gonzales*, 273 S.W. at 798 (the legislature is powerless to deprive either spouse of such rights as come within the protection of the Texas Constitution). A person or family cannot have more than one homestead under Texas law. *See* TEX. PROP. CODE ANN. § 41.002 (West 2000) (defining a homestead). Among other things, a homestead enjoys certain tax benefits and cannot be used to satisfy the claims of general creditors, *i.e.*, those other than the bank that lent the money to the debtor to acquire the property designated as his homestead. As such, Brown may only acquire a separate homestead upon the entry of a final decree of divorce. *See* TEX. FAM. CODE ANN. § 7.001 (West 2006) (the family court shall order a just and right division of the estate of the parties).

**SLATKIN & REYNOLDS, P.A.**
One East Broward Boulevard, Suite 609, Fort Lauderdale, Florida 33301 Telephone 954.745.5880

other employees of SMI were paid. However, as is detailed in the Fourth Amended Petition, the Debtor has intentionally mismanaged SMI and has breached his fiduciary duties to the various doctors and other business partners, which led to the filing of the Barrett Creditors' lawsuit.

8.      While the Debtor appears to have purchased properties in Florida, it also does not appear that those properties are currently in the Debtor's name. Rather, it appears that the Debtor created a limited liability company, M.G. Brown Co., LLC, to hold title to the properties. Moreover, the property located in Florida is nowhere near as significant as those located in Texas.

9.      To the extent that the Debtor has purchased assets in Florida, he may have done so in violation of various court orders entered by a Texas family court in the pending divorce case with his wife, Rachel Brown.  Rachel Brown has filed a motion for relief from stay so that she may proceed with a contempt hearing and has outlined the various violations of the family court orders. Accordingly, it does not seem possible that the Debtor could have legitimately acquired property in Florida, given that he has violated court orders when he purchased the various properties in Florida, either directly or indirectly, and furthermore violated the court's order when he moved to Florida and relocated personal property to Florida.[2]

10.      Based on the fact that it does not appear that the Debtor could have resided or been domiciled in Florida for the greater part of the 180 days prior to the Petition Date, and furthermore because the Debtor's assets appear to be located in Texas, venue does not appear to be proper in this Court. If venue is not proper in this Court, then the Court must either dismiss the case or transfer it to the Southern District of Texas.

---

[2]      It appears the Debtor may have purged the contempt of moving without notifying the Texas family court by ultimately notifying the Texas family court of his move to Florida. Nonetheless, it is readily apparent that the Debtor is not interested in obeying court orders or otherwise complying with his requirements under the law.

SLATKIN & REYNOLDS, P.A.
One East Broward Boulevard, Suite 609, Fort Lauderdale, Florida 33301 Telephone 954.745.5880

11.    The Texas Litigation Creditors do not wish for this case to be dismissed. As has been alleged in the motion for relief from stay that Rachel Brown filed, the Debtor has no interest in abiding by his legal obligations, and has instead engaged in fraudulent activities intended on damaging the Texas Litigation Creditors, has engaged in the intentional removal of millions of dollars from SMI to the detriment of the Texas Litigation Creditors and others, and has engaged in an intentionally reckless expenditure of assets designed to dissipate his assets in order to frustrate the claims of his creditors.

12.    Given that the Debtor has chosen voluntarily to file bankruptcy, the Texas Litigation Creditors do not wish to see the case dismissed. Rather, the Texas Litigation Creditors respectfully request the Court transfer the case to the Southern District of Texas, where venue is proper based on the Debtor's residence, domicile and location of the vast majority of the Debtor's assets and creditors' claims.

13.    In the alternative, even if, however, venue could somehow be established here, notwithstanding the Debtor's fraudulent conduct and his violation of prepetition court orders, it is nonetheless appropriate for the Court to transfer venue to the Southern District of Texas pursuant to 11 U.S.C. § 1412, which authorizes the transfer of venue of a Title 11 case or proceeding "[I]n the interest of justice or the convenience of the parties." The majority of the factors that courts refer to when considering whether or not to transfer a case weigh in favor of the transfer of this case.

14.    As a preliminary matter, although 28 U.S.C. § 1412 does not state what constitutes the "interest of justice" or "convenience of the parties" and does not, on its face, apply to the determination of whether or not a case should be transferred when venue is improper, courts have applied this statute to consider when determining whether or not transfer a venue is appropriate. *In re Newport Creamery*, *Inc.*, 265 B.R. 614, 618 (Bankr. M.D. Fla. 2001).

8

15.     The factors to be considered when a discretionary transfer of venue is requested are set forth in the opinion of the Court of Appeals for the Fifth Circuit in *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1247 (5ᵗʰ Cir. 1979).[3] The factors include:

(1) The proximity of creditors of every kind to the Court;
(2) The proximity of the debtors to the Court;
(3) The proximity of the witnesses necessary to the administration of the estate;
(4) The location of the assets;
(5) The economic administration of the estate; and
(6) The necessity for ancillary administration if liquidation should result.

*In re Commonwealth Oil Refining Co., Inc.*, 596, F.2d 1239 (5ᵗʰ Cir. 1979), *cert denied,* 444 U.S. 1045, 100 S. Ct. 132, 62 L. Ed 2d 731 (1980)).

16.     The application of these factors is slightly difficult at the instant time since the Debtor has failed to file complete Schedules and may never, but based on what information is known, the vast majority of the facts weigh in favor of transfer.

17.     **The Proximity of Creditors of Every Kind to the Court.** While the Debtor has not filed complete Schedules, from the limited information that the Debtor has provided, the largest creditors appear to be the Debtor's wife, Rachel Brown, who resides in Texas; the Texas Community Bank, which is located in The Woodlands, Texas; the Texas Litigation Creditors who are parties hereto  are located in various locations. Barrett resides in Phoenix, Arizona. Guyot resides in Arizona. The various other Barrett Creditors are all Texas companies. Drs. Ledesma and Singleton both reside in Texas. Accordingly, all of the above creditors reside in Texas with the exception of Barrett and Guyot, who reside in Arizona. Importantly, none of these creditors are located in Florida.

---

[3]     Decisions of the Court of Appeals for the Fifth Circuit issued prior to October 1, 1981 are binding on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1212 (11ᵗʰ Cir. 1981).

**SLATKIN & REYNOLDS, P.A.**
One East Broward Boulevard, Suite 609, Fort Lauderdale, Florida 33301 Telephone 954.745.5880

18.      Looking at the list of other creditors contained in the Debtor's 20 Largest Creditors, Bank of the Internet, USA, is located in San Diego, California. It is of course undisputed that San Diego is much closer to Texas than it is to Florida. The next creditor listed is Iberia Bank. The Debtor listed addresses for Iberia Bank is Louisiana and according to Iberia Bank's website, it is based in Lafayette, Louisiana. The Texas Litigation Creditors recognize that since 2010, Iberia Bank has maintained locations within the Southern District of Florida. However, the Texas Litigation Creditors are unsure if any of the employees of Iberia Bank that are present in this district would be able to assist in this case, and thus, do not believe it is appropriate to consider Iberia Bank as a "Florida" creditor, given that all of the loan activity appears to have taken place in Texas and/or Louisiana and that all of the people intimately familiar with the Debtor's business activity as related to Iberia Bank are located in either Texas or Louisiana. The final creditor listed in the incomplete List of 20 Largest Creditors is TIB Oklahoma. The address given for TIB Oklahoma, which appears to be a credit card, is located in Dallas, Texas.

19.      Accordingly, the only creditor that is known at the time that even arguably could be considered a Florida creditor is Iberia Bank. All remaining creditors are  located in Louisiana, Texas or locations further west, which are geographically much further from Florida. Accordingly, this factor weighs in favor of transfer.

20.      **The Proximity of Debtors to the Court.** While it appears at first blush that the Debtor is much closer to this Court than to the Southern District of Texas, it is difficult, if not impossible to know whether that is truly accurate. As noted above, the Debtor still owns a home in Houston, Texas, owns other properties in Texas, lived at the Four Seasons for months at a time, and appears to have resided in any number of places outside the Southern District of Florida for at least short amounts of time, if not longer. For example, the motion of Rachel

Brown indicates that the Debtor lived in Clearwater, Florida for at least one month, and further alleges that, based on his credit card charges, he spent time in New York City.. Thus, even if it is arguably true that the Debtor's claims that he currently resides in Florida are accurate,  the Debtor's evasiveness, his continued movements throughout the country and his violation of court orders demonstrate that the Debtor may very well not reside or be close to this Court.

21.     **Proximity of Witnesses Necessary to the Administration of the Estate.** The most important witnesses to the administration of this estate, other than the Debtor, will be the persons with knowledge of the Debtor's companies, and in particular, SMI. SMI is the primary company that generates funds that the Debtor ultimately receives as the sole shareholder of SMI. Accordingly, the most important witnesses in this case include employees of SMI, who are located in Houston, Texas.

22.     Guyot was the manager of SMI for years. Guyot assisted the Debtor in building SMI into the successful company that it is today. Other employees of SMI, as well as accountants and other persons with financial knowledge of the company, will be important in assisting in the operation of SMI, which is most likely the Debtor's most valuable asset. All of those persons are in Texas. Moreover, the records of SMI are in Texas. Most of the Debtor's other companies are incorporated and located in Texas. The Debtor appears to have started two limited liability companies in Florida. One of those limited liability companies, MG Brown Company, LLC, appears to only own real estate and personal property and does not appear to run a business or otherwise need significant attention, other than to locate and recover all of its assets. Accordingly, its operation does not require a "hands on" person, unlike the operation of SMI, which will require very close supervision, a thorough review of records and the investigation of the company. All of the above will be much easier if done from Texas, given that all of the witnesses, records and otherwise are there.

**SLATKIN & REYNOLDS, P.A.**
One East Broward Boulevard, Suite 609, Fort Lauderdale, Florida 33301 Telephone 954.745.5880

23.     The other Florida limited liability company that the Debtor created, ProMed, LLC, does not, upon information and belief, conduct any business. It is possible that the Debtor, SMI, or other companies may have transferred assets to ProMed. However, upon information and belief, the Debtor's plan to move to Florida, to create ProMed and transfer all of the assets from SMI to ProMed was never completed because the Debtor would have been in contempt of the Texas Family court if he had undertaken to direct the transfer of these assets. Accordingly, there are no witnesses in Florida, other than perhaps the Debtor, if his residence designation is in fact accurate, who would or could assist in this case.

24.     Conversely, all of the persons and records related to SMI, as well as the Debtor's other assets and even the Debtor's wife, who will no doubt be a witness in the case, are all in Texas. Thus, this factor also weighs in favor of transfer.

25.     **The Location of Assets.** Again, because the Debtor has failed to file Schedules, it is not exactly clear where all of the Debtor's assets are located. The Texas Litigation Creditors, however, know this much. SMI is the Debtor's most valuable asset. SMI is a Texas corporation. The Debtor owns several parcels of real estate in Texas. These parcels include the Debtor's prior residence, at 9110 Memorial Drive, Houston, Texas and a property located at 706 Buckingham, Houston, Texas,[4] that is referred to in Rachel Brown's motion for stay relief. Upon information and belief, the Texas Litigation Creditors also believe that the Debtor, through a corporation under his ownership and control, owns a ranch in Texas and may own certain other parcels of property in the area either adjacent to or close by the 9110 Memorial Drive property. In addition

---

[4]     Upon information and belief, this property is owned by Superior Vehicle Leasing Co., Inc., a Texas corporation in which the Debtor is known to be the sole officer and director. Upon information and belief, the Debtor owns all common stock in this corporation.

to the real property and SMI, the Debtor is the sole shareholder, member, manager, and otherwise of several other companies, all of which are located in Texas.

26.    The Texas Litigation Creditors believe that SMI is the most valuable of these companies. It is the Texas Litigation Creditors' understanding that SMI may have outstanding receivables of close to $50 million. Thus, even when the real estate that the Debtor has purchased through the MG Brown Company, LLC is included, and the personal property set forth in Rachel Brown's motion for relief from stay is included, the value of SMI dwarfs everything else that the Debtor may own.

27.    Moreover, as described in further detail below, there are serious issues as to what assets will constitute community property under Texas law and what will not. Given that assets in Texas will be subject to Texas' community property laws,[5] how those assets are administered in a Chapter 11 case, or any subsequent Chapter 7 case if the matter is converted, is a an issue of

---

[5]    Under Texas law, all property of a marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003 (West 2000). A spouse may overcome this presumption with clear and convincing evidence that property is separate property. *Id*. Separate property is defined as that property which is: (1) owned by the spouse prior to the marriage, (2) property acquired by the spouse by gift, devise, or descent, regardless of the date of the marriage, and (3) recovery by a spouse for personal injuries and/or loss of earning capacity. TEX. FAM. CODE ANN. § 3.001 (West 2006). Even if property is separate property, income produced by separate property during the marriage is community property. *Colden v. Alexander*, 171 S.W.2d 328, 334 (Tex. 1943); *see also Commissioner of Internal Revenue v. Terry*, 69 F.2d 969, 969 (5th Cir. 1934) (applying Texas law). Where the value of separate property increases during the marriage, such increase in value remains separate property. However, the community may be entitled to reimbursement where a spouse spends substantially all of his time, toil, talent, or effort in enhancing the value of his separate estate at the expense of the community estate. *See* TEX. FAM. CODE ANN. § 3.402 (West. 2006); *see also Vallone v. Vallone*, 644 S.W.2d 455, 458–59 (Tex. 1982) (analyzing the right to reimbursement). The right to reimbursement is determined using equitable principles. TEX. FAM. CODE ANN. § 3.402(b). While this traditional equitable remedy has been made a statutory right, the family court is bound to look at all facts and circumstances to determine what is fair, just and equitable when considering the division of the community estate and all reimbursement claims. *Nelson v. Nelson*, 193 S.W.3d 624, 632 (Tex.App. 2006). These principles contrast with Florida law where income from separate property remains separate property and where increases in value of separate property are considered to be marital property.

Texas law that does not exist in Florida. Thus, the location of assets takes on a greater role in this case given the differences in property laws between the two states.

28.    **Economic Administration of the Estate.** It goes without saying that, if the vast majority of the Debtor's assets are in Texas, then it is more economical for a trustee in Texas to administer the assets, if in fact a trustee is appointed. The assets located in Florida appear to be less significant than what is located in Texas. The assets in Florida include real property and perhaps any personal property the Debtor has purchased and/or relocated here in violation of the Texas family court's order. Personal property, of course, is easy to take care of once it is located and accounted for. As to vehicles and yachts, they are simply tied up, locked up, or otherwise secured and stored until such time as they can be sold. The same is true of real property, which can also be secured.

29.    On the other hand, given that the most important assets of the Debtor appear to be his businesses, it is far more economical for those assets to be administered and operated locally. A trustee will no doubt need to hire an accountant to review the records of the companies in order to determine their true worth. As noted above, these companies may be worth tens of millions of dollars and may be the most significant source of recovery for the Debtor's creditors. Moreover, the companies may have claims against the Debtor for breaches of duties, dissipation of assets or otherwise. Those claims will need to be brought under Texas law, and it will certainly be more economical for the trustee to hire counsel well versed in Texas law than it would be for an out of state trustee to get "up to speed" on Texas law and determine the appropriate course of action with various assets.

30.    Conversely, once an out of state trustee is able to secure the assets in Florida, he or she can hire real estate brokers and other professionals to help sell them, and not have to worry about their day-to-day operation. Plus, it will be much easier for a trustee to sell real

and/or personal property than it will to sell the operations of SMI, given that SMI is a multi-million dollar company and any buyers will want to perform adequate due diligence.

31.      As Judge Williamson noted in *Newport Creamery*, "[I]t is simply not economical to conduct a chapter 11 case in an inconvenient forum such as the Middle District of Florida when the debtor operates in Rhode Island, Connecticut and Massachusetts." *Newport Creamery*, 265, B.R. at 620. Likewise, even though this is an individual's case, it is simply not economical to conduct this Chapter 11 case in the Southern District of Florida when the most important asset, the business of SMI, is located in Texas.

32.      **Necessity for Ancillary Administration if Liquidation Should Result.** As noted above, it is the Texas Litigation Creditors' belief that this case cries out of the appointment of a Chapter 11 trustee. Given all of the factors above, the Texas Litigation Creditors respectfully assert that it is most appropriate that that trustee be appointed in Texas. As noted above, the administration of assets in Texas, pursuant to Texas community property law, will play a large factor in this case. Moreover, one of the largest claimants in the case is Rachel Brown, the Debtor's current wife. Accordingly, there will be issues of Texas family law that will arise in resolving whatever claims she may or may not have in the estate, as well as how her community property ultimately comes into the estate.

33.      Additionally, the continued necessity to oversee the operations of SMI and the Debtor's other companies by a trustee would be much easier if they were done in Houston. All of the necessary persons who could provide the trustee with information and otherwise assist the trustee or located in Houston. All of the records are presumably located in Texas, assuming the Debtor has not removed, concealed or destroyed them. Accordingly, everything that is necessary for a trustee to administer a case is in Houston. It thus goes without saying that appointment of a

trustee who is already in Houston, once the case has been transferred, is the most efficient manner to proceed in this case.

34.     Based on all of the foregoing, there is very little doubt that this case should be transferred to the Southern District of Texas. All of the *Commonwealth Oil* factors are present with the possible exception of one. That factor, the location of the Debtor, may not weigh in favor of anyone given that the Debtor has both lived in Houston recently, including staying at the Four Seasons for months at a time, allegedly lived in Miami, Florida and traveled throughout various parties of the country.

35.     **Interest of the States in Which the Debtor Operates.** Judge Williamson added this factor to the consideration of the issue of discretionary transfer in his *Newport Creamery* decision. Although the State of Texas has not appeared in this case, and conceding that this factor is a little more difficult to apply in this case than it was in *Newport Creamery*, this factor still weighs in favor of transfer. As noted above, there are potential disputes involving Texas law, whether it is the Texas Litigation Creditors' claims, the family law claims, the community property claims, or otherwise, that may need to be resolved through the course of the bankruptcy case. "[A] state's interest in having local controversies decided within its borders" is a factor courts should consider in deciding whether it is appropriate to transfer venue. *Newport Creamery*, 265 B.R. at 621 (citing *In re Standard Tank Cleaning Corp.*, 133 B.R. 562, 567 (Bankr. E.D.N.Y 1991) (citations omitted)). Moreover, if any investigation uncovers activity that should be referred to the proper authorities, the State of Texas will have an interest in learning what the Debtor has been doing. All of these are issues that the state of Texas will have an interest in, and thus this factor weighs in favor of transfer of venue.

36.     There is also an important policy consideration that the Texas Litigation Creditors respectfully request the Court consider in this matter, and perhaps include as a factor that should

be considered along with the other *Commonwealth Oil* and *Newport Creamery* factors. Even if venue is technically proper, it appears from all of the activity set forth above that the Debtor has fraudulently engineered venue in this Court by buying properties and otherwise intentionally and recklessly spending monies that would otherwise be available for distribution to creditors. There are at least three pieces of real estate in Dade County, Florida that have been purchased, as well as cars, yachts, and other personal property on which the Debtor has spent hundreds of thousands, if not millions, of dollars. The allegations set forth in Rachel Brown's motion for stay relief show the Debtor has zero intention of ever doing anything to assist his creditors or to comply with orders of any court. This Court should  not condone the Debtor's behavior and should not condone the Debtor's intentional disenfranchising of his creditors by allowing the Debtor to proceed in this Court when his case properly belongs in the Southern District of Texas. The Texas Litigation Creditors have already heard rumors of the Debtor bragging to persons that he has figured out a way to continually frustrate the Texas Litigation Creditors and will continue to do so as long as possible. Transfer of this case to Houston, Texas will go a long way towards demonstrating to the Debtor that such behavior will not be tolerated, and that the bankruptcy courts will not tolerate debtors who are evasive, hide assets, violate court orders whether or not they are bankruptcy court orders, and will not condone gamesmanship and other activities that are clearly designed to frustrate creditors and "muck up" the system. A transfer to Houston, where a trustee should be appointed in short order, will deprive the Debtor of the ability to continue to play the games that the Debtor has played and will allow his creditors to finally recover on their claims.

37.    Accordingly, transfer is also proper from a policy standpoint in that the Court should not condone debtors who are able to rig their lifestyles and cases in such a manner to

achieve venue in a place that is most inconvenient for everyone else in the case, except the Debtor.

38.    In sum, even if venue is technically proper in this Court, the vast, vast majority of facts and factors support transfer of this case to the Southern District of Texas. The Texas Litigation Creditors therefore request the Court grant their motion and transfer venue so they can begin the process of seeing their claims satisfied through the bankruptcy process.

WHEREFORE, for the reasons stated herein, the Texas Litigation Creditors respectfully request the Court grant this Motion, transfer venue of this case to the United States Bankruptcy Court for the Southern District of Texas forthwith, as well as grant any further relief the Court deems proper under the circumstances.

> I hereby certify that I am admitted to the Bar of the United States District Court, and that I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

Dated this 1st day of February 2013.

SLATKIN & REYNOLDS, P.A.
Attorneys for the Texas Litigation Creditors
One East Broward Boulevard, Suite 609
Fort Lauderdale, Florida 33301
Telephone 954.745.5880
Facsimile 954.745.5890
rreynolds@slatkinreynolds.com

By: /s/ Robert F. Reynolds
    ROBERT F. REYNOLDS
    Fla. Bar No. 174823

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been furnished via the Court's CM/ECF electronic noticing system to Office of the US Trustee, USTPRegion21.MM.ECF@usdoj.gov; Alan R. Crane, Trustee, acrane@furrcohen.com, pmouton@furrcohen.com; Brett A. Elam, Esq., belam@brettelamlaw.com, info@brettelamlaw.com and all other parties entitled to receive notice via the Court's CM/ECF noticing system and via U.S. mail to all persons listed on the Debtor's List of 20 Largest Creditors on this 1st day of February 2013.

/s/ Robert F. Reynolds
ROBERT F. REYNOLDS

SLATKIN & REYNOLDS, P.A.
One East Broward Boulevard, Suite 609, Fort Lauderdale, Florida 33301 Telephone 954.745.5880

# EXHIBIT "1"

No. 2012-07519

| | | |
|---|---|---|
| STEPHEN BARRETT, STEPHEN BARRETT DPM, PA; STEPHEN BARRETT DPM, AUSTIN, PA; DTEPHEN BARRETT DPM, DFW, PA; STEPHEN BARRETT DPM, SAN ANTONIO, PA; BARRETT FOOT & ANKLE, P.C.; PETER BREGMAN; CHARLES SINGLETON; GARY L. CRAMER; and PAUL V. LEDESMA, *Plaintiffs*, | § § § § § § § § § § § | IN THE DISTRICT COURT |
| **v.** | § § | |
| BROWN MEDICAL CENTER, INC. f/k/a SURGEON'S MANAGEMENT, INC.; BHCF, LLC; and MICHAEL G. BROWN, *Defendants*, | § § § § § § | OF HARRIS COUNTY, TEXAS |
| **v.** | § § | |
| MANUEL GUYOT; BARRETT FOOT AND ANKLE CENTER, PHOENIX, LLC; CHARLENE McCULLAR; and AMELIA NAJERA, *Third-Party Defendants.* | § § § § § | 333RD JUDICIAL DISTRICT |

---

## PLAINTIFFS' FOURTH AMENDED PETITION

---

TO THE HONORABLE JOSEPH J. HALBACH, JR.:

Plaintiffs, Stephen Barrett; Stephen Barrett DPM, PA; Stephen Barrett DPM, Austin, PA; Stephen Barrett, DPM, DFW, PA; Stephen Barrett, DPM, San Antonio, PA; Barrett Foot & Ankle Centers, Las Vegas, P.C.; Barrett Foot & Ankle, P.C.; Charles Singleton; and Paul V. Ledesma, complain of Defendants, BHCF, LLC; Brown Medical Center, Inc.; Michael G. Brown; M.G. Brown Investment Group, LLC; M.G. Brown International, LLC; ProMed, LLC;

Instratek, Inc.; Brown Surgical Investments Partners, Austin, LLC; Brown Surgical Investments, Austin, LLC; Brown Partners, Austin, LLC; Allied Center for Special Surgery, Austin, LLC; Brown Surgical Investments Partners, Las Vegas, LLC; Brown Surgical Investments, Las Vegas, LLC; Brown Partners, Las Vegas, LLC; Allied Center for Special Surgery, Las Vegas, LLC; Brown Surgical Investments Partners, San Antonio, LLC; Brown Surgical Investments, San Antonio, LLC; Brown Partners, San Antonio, LLC; Allied Center for Special Surgery, San Antonio, LLC; Brown Surgical Investments Partners, DFW, LLC; Brown Surgical Investments, DFW, LLC; Brown Partners, DFW, LLC; Allied Center for Special Surgery, DFW, LLC; Brown Surgical Investments Partners, Scottsdale, LLC; Brown Surgical Investments, Scottsdale, LLC; Brown Partners, Scottsdale, LLC; and Allied Center for Special Surgery, Scottsdale, LLC. In support, the Plaintiffs plead:

## I.

### Discovery Control Plan

1.      Plaintiffs request that discovery be conducted under Level 3 pursuant to the TEX. R. CIV. P. 190.4.

## II.

### Parties

2.      Plaintiff, STEPHEN BARRETT, DPM, is an individual who resides and practices podiatric medicine and surgery in Phoenix, Arizona. Dr. Barrett is also licensed as a physician in Texas. Dr. Barrett brings the claims herein in both his individual capacity and derivatively, on behalf of Brown Surgical Investments Partners, Austin, LLC; Brown Surgical Investments Part-

ners, Las Vegas, LLC; Brown Surgical Investments Partners, San Antonio, LLC; Brown Surgical Investments Partners, DFW, LLC; and Brown Surgical Investments Partners, Scottsdale, LLC.

3.      Plaintiff, STEPHEN BARRETT, DPM, PA, is a Texas professional association with its principal office located in Houston, Texas.

4.      Plaintiff, STEPHEN BARRETT, DPM, AUSTIN, PA, is a Texas professional association with its principal office located in Austin, Texas.

5.      Plaintiff, STEPHEN BARRETT, DPM, DFW, PA, is a Texas professional association with its principal office located in Fort Worth, Texas.

6.      Plaintiff, STEPHEN BARRETT, DPM, SAN ANTONIO, PA, is a Texas professional association with its principal office located in San Antonio, Texas.

7.      Plaintiff, BARRETT FOOT & ANKLE, P.C., is a Nevada professional corporation with its principal office located in Las Vegas, Nevada.

8.      Plaintiff, CHARLES "ED" SINGLETON, D.P.M., is an individual who resides and practices podiatric medicine and surgery in Fort Worth, Texas. Dr. Singleton brings the claims herein in both his individual capacity and derivatively, on behalf of Brown Surgical Investments Partners, DFW, LLC.

9.      Plaintiff, PAUL V. LEDESMA D.P.M., is an individual who resides and practices podiatric medicine and surgery in Scottsdale, Arizona. Dr. Ledesma brings the claims herein in both his individual capacity and derivatively, on behalf of Brown Surgical Investments Partners, Scottsdale, LLC.

10.     Defendant, BHCF, LLC, is a Texas limited liability company with its principal place of business in Harris County, Texas. BHCF, LLC may be served with process through its

registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234. As of the time of the filing of this amended petition, the Defendant has appeared and answered.

11.     Defendant, BROWN MEDICAL CENTER, INC. f/k/a Surgeon's Management, Inc., is a Texas corporation with its principal place of business in Harris County, Texas. Surgeon's Management, Inc. may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234. As of the time of the filing of this amended petition, the Defendant has appeared and answered.

12.     Defendant, MICHAEL G. BROWN, is an individual who resides in Houston, Harris County, Texas. Brown may be served with process at his home located at 9110 Memorial Drive, Houston, Texas 77024, his room(s) at the Four Seasons Hotel located at 1300 Lamar Street, Houston, Texas 77010, or wherever else he may be found. As of the time of the filing of this amended petition, the Defendant has appeared and answered.

13.     Defendant, M.G. BROWN INVESTMENT GROUP, LLC, is a Texas limited liability company. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

14.     Defendant, M.G. BROWN INTERNATIONAL, LLC, is a Texas limited liability company. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

15.     Defendant, PROMED, LLC, is a limited liability company formed under the laws of the state of Florida. It may be served with process through its registered agent, NRAI Services, Inc., 515 East Park Avenue, Tallahassee, Florida 32301.

16.     Intervenor and Defendant, INSTRATEK, INC., is a corporation formed under the laws of the State of Texas. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234. As of the time of the filing of this amended petition, Instratek, Inc. has intervened in this lawsuit.

17.     BROWN SURGICAL INVESTMENTS PARTNERS, AUSTIN, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

18.     BROWN SURGICAL INVESTMENTS, AUSTIN, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

19.     BROWN PARTNERS, AUSTIN, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

20.     ALLIED CENTER FOR SPECIAL SURGERY, AUSTIN, LLC, d/b/a "St. Michael's Center for Special Surgery, Austin, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

21.     BROWN SURGICAL INVESTMENTS PARTNERS, LAS VEGAS, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

22.    BROWN SURGICAL INVESTMENTS, LAS VEGAS, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

23.    BROWN PARTNERS, LAS VEGAS, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

24.    ALLIED CENTER FOR SPECIAL SURGERY, LAS VEGAS, LLC, d/b/a "St. Michael's Center for Special Surgery, Las Vegas, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

25.    BROWN SURGICAL INVESTMENTS PARTNERS, SAN ANTONIO, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

26.    BROWN SURGICAL INVESTMENTS, SAN ANTONIO, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

27.    BROWN PARTNERS, SAN ANTONIO, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

28.     ALLIED CENTER FOR SPECIAL SURGERY, SAN ANTONIO, LLC, d/b/a "St. Michael's Center for Special Surgery, San Antonio, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

29.     BROWN SURGICAL INVESTMENTS PARTNERS, DFW, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

30.     BROWN SURGICAL INVESTMENTS, DFW, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

31.     BROWN PARTNERS, DFW, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

32.     ALLIED CENTER FOR SPECIAL SURGERY, DFW, LLC, d/b/a "St. Michael's Center for Special Surgery, DFW, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

33.     BROWN SURGICAL INVESTMENTS PARTNERS, SCOTTSDALE, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

34.     BROWN SURGICAL INVESTMENTS, SCOTTSDALE, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

35.     BROWN PARTNERS, SCOTTSDALE, LLC, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

36.     ALLIED CENTER FOR SPECIAL SURGERY, SCOTTSDALE, LLC, d/b/a "St. Michael's Center for Special Surgery, Scottsdale, is a Texas limited liability company entitled to citation and notice of this lawsuit. It may be served with process through its registered agent, CT Corporation System, 350 N. St. Paul St., Ste. 2900, Dallas, Texas 75201-4234.

## III.

### Jurisdiction and Venue

37.     This Court has subject matter jurisdiction because the amount in controversy exceeds its minimum jurisdictional limits. This Court also has personal jurisdiction over all Defendants because they were either organized under Texas law or reside within the State of Texas.

38.     Venue is proper is Harris County, Texas because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County. In addition, multiple Defendants maintain their principal places of business in Harris County, Texas. In addition, Defendants, BHCF, LLC and BROWN MEDICAL CENTER, INC., contractually agreed to venue in Harris County, Texas.

## IV.

### Factual Background

**A.  Barrett Foot & Ankle**

39.      STEPHEN BARRETT, D.P.M. owns 80 percent of the stock in STEPHEN BARRETT, DPM, PA. He owns 100 percent of the stock in STEPHEN BARRETT, DPM, AUSTIN, PA; STEPHEN BARRETT, DPM, DFW, PA, STEPHEN BARRETT, DPM, SAN ANTONIO, PA, and BARRETT FOOT & ANKLE, P.C. (collectively the *"Barrett PAs"*). Dr. Barrett is a minority member with an ownership interest in BARRETT FOOT & ANKLE CENTERS, PHOENIX, LLC.

40.      Dr. Charles "Ed" Singleton is an employee of Stephen Barrett, DPM, DFW, PA, and he is a member in Brown Surgical Investments Partners, DFW, LLC.

41.      Dr. Paul V. Ledesma is a former employee of Barrett Foot & Ankle Centers, Phoenix, LLC, and he is a member in Brown Surgical Investments Partners, Scottsdale, LLC.

42.      Dr. Stephen Barrett, Dr. Charles "Ed" Singleton, and Dr. Paul V. Ledesma (collectively the "Plaintiff Physicians") are licensed surgeons who specialize in podiatric medicine.

**B.  The Franchise Agreements**

43.      In 2008, the Barrett PAs and Barrett Foot & Ankle Centers, Phoenix, LLC (collectively the *"Barrett Foot & Ankle Centers"*) entered into a series of Franchise Agreements with BHCF, LLC (*"BHCF"*). The Franchise Agreements established the Barrett Foot & Ankle Centers as franchises of BHCF in exchange for a payment of a royalty of 15 percent of each of the Barrett Foot & Ankle Centers' monthly gross revenues. At the time the parties entered into the Franchise Agreements, BHCF was an established business that was known as an innovator in the field of endoscopic surgery of the hand and wrist. Dr. Barrett, having developed similar surgical

techniques for treatment of foot disorders, caused the Barrett Foot & Ankle Centers to enter into the Franchise Agreements for the purpose of marketing and establishing their own brand by virtue of their association with BHCF.

44.    The parties to the Franchise Agreements specifically agreed that the Barrett Foot & Ankle Centers would own and operate the franchises and that the Barrett Foot & Ankle Centers would be solely responsible for their day-to-day management and operation. The parties further agreed and understood that BHCF had no authority or right to control the Barrett Foot & Ankle Centers' medical practices in any way. For instance, the parties agreed that the Barrett Foot & Ankle Centers had the sole authority to set prices for the medical services their doctors provided to patients. Further, the parties agreed the Barrett Foot & Ankle Centers would hire and maintain their own personnel, and would have exclusive supervision and control of such personnel. In addition, the parties agreed that the Barrett Foot & Ankle Centers and their physicians were not employees of BHCF, but rather the Barrett Foot & Ankle Centers would be solely independent contractors.

45.    BHCF is under the direct control of Michael G. Brown, its President and CEO. Therefore, any actions taken by BHCF with respect to its Franchise Agreements with the Barrett Foot & Ankle Centers are the direct result of the instructions, demands, or dictates of Brown.

C.    The Management Services Agreements

46.    The Barrett Foot & Ankle Centers also entered into a series of Management Services Agreements with Brown Medical Center, Inc. f/k/a Surgeon's Management, Inc. ("*SMI*"), an entity under Brown's exclusive control. Brown is the President and CEO of SMI, and similarly any actions taken by SMI with respect to the Management Services Agreements

with the Barrett Foot & Ankle Centers are the direct result of the instructions, demands, or dictates of Brown.

47.     Under the Management Services Agreements, SMI agreed to provide practice management, administrative, and support functions to enable the Barrett Foot & Ankle Centers and their physicians to concentrate on their medical practice. Specifically, SMI agreed to provide the Barrett Foot & Ankle Centers with leased facilities and all equipment, supplies, and support services necessary for the Barrett Foot & Ankle Centers' medical practices. In addition, SMI is responsible for billing, collection, and making distributions as provided in the agreement. All billings, collections of the Barrett PAs' receivables, and management of the Barrett PAs' cash was contractually delegated, in trust, to SMI. SMI was also required to provide all utilities and related services to ensure that the Barrett Foot & Ankle Centers and their physicians are able to treat their patients at the provided facilities.

48.     In exchange for SMI's services, the Barrett Foot & Ankle Centers agreed to pay SMI a substantial fee, which includes an 8 percent service fee of all net monthly collections for billing and collection services, and a 58 percent service fee of all net monthly collections for management and administrative services, personnel, facility, and equipment.

49.     Under the Management Services Agreements, the Barrett Foot & Ankle Centers and their physicians retained all authority to direct the medical, professional, and ethical aspects of their medical practices, including the admission of new patients and providing care to their patients.

50.     SMI is responsible for selecting, training, supervising, and terminating all management, administrative, clerical, secretarial, bookkeeping, accounting, payroll, billing and collec-

tion, and other non-professional personnel for the performance of SMI's duties under the Management Services Agreements.

51.    The Barrett Foot & Ankle Centers and SMI expressly agreed that they were independent contractors and their agreement did not create an employment relationship between the parties. Therefore, SMI has no authority to hire, terminate, or otherwise take any action whatsoever with respect to any of the Plaintiff Physicians or any other physicians practicing medicine with the Barrett Foot & Ankle Centers. In fact, the Management Services Agreements provide that the Barrett Foot & Ankle Centers retain their physicians in their sole discretion.

52.    All funds generated from SMI's billing and collections on behalf of, and as agent of, the Barrett Foot & Ankle Centers are required to be placed into a depository account. SMI is only authorized to make distributions from the account as provided in the Management Services Agreements. The Barrett Foot & Ankle Centers expressly retain all rights in and to the funds deposited in the account, and SMI is required to maintain records of the receipt and disbursement of funds from the account.

53.    In billing and collecting money from patients on behalf of the Barrett Foot & Ankle Centers, SMI recognized under the Management Services Agreements that the Barrett Foot & Ankle Centers have complete responsibility for their medical practices. SMI expressly agreed not to interfere with the exercise of medical judgment or be involved in the care or treatment of patients. Moreover, SMI agreed that it would not interfere with, control, direct or supervise the Barrett Foot & Ankle Centers or their physicians in connection with the provision of medical services. Under the Management Services Agreements, SMI's employees, when assisting with the

performance of any medical functions, are subject to the direction and control of the Barrett Foot & Ankle Centers and their physicians.

54.    Importantly, SMI expressly agreed that the Barrett Foot & Ankle Centers would establish the fees to be charged for medical services and that SMI has no authority whatsoever with respect to the establishment of such fees. Significantly, SMI agreed to comply with all applicable law in the conduct of its obligations under the Management Services Agreements. SMI's agreement to comply with applicable law includes the billing of the Barrett Foot & Ankle Centers' patients.

55.    All of the management services agreements at issue were identical, except for the identity of the particular contracting parties. Pursuant to each management services agreement, SMI was appointed as the attorney-in-fact and trustee over the associated Barret PA's "depository account."[1] Specifically, each management services agreement provided as follows:

> In connection with the billing, collection and cash management services to be provided hereunder, and throughout the Term, [PA] hereby grants to [SMI] an exclusive special power of attorney and appoints [SMI] as [PA's] exclusive true and lawful **agent** and **attorney-in-fact**, and [SMI] hereby accepts such special power of attorney and appointment, for the following purposes: ... To bill ... patients; ... to collect and receive ... all Accounts Receivable ... ; [t]o deposit all amounts collected into the Depository Account ... ; [t]o sign checks ... and to make withdrawals from the Depository Account for payments specified in this Agreement ....

> Throughout the Term, [PA] hereby grants to [SMI] an exclusive special power of attorney for the purposes stated herein and appoints [SMI] as [PA's] exclusive true and lawful **agent** and **attorney-in-fact**, and [SMI] hereby accepts such special

---

[1] The "depository account" was an account into which all of the particular Barrett PA's cash collections were deposited and over which SMI had absolute, exclusive authority and control, in trust, as agent for each of the respective Barrett PAs. SMI was charged with managing and disbursing the funds in the account as required under the management services agreement. However, the Barrett PA retained ownership of, and all rights in and to the funds deposited into the account and all rights remained with the Barrett PA. Each Barrett PA retained ownership of its Depository Account.

power of attorney and appointment, to deposit into the Depository Account as and when received all funds, fees and revenues generated from [PA's] provision of Medical Services.

(emphasis added).

56.    Each management services agreement provided that SMI was, each month, to apply the funds in the respective Barrett PA's Depository Account in the following order:

a.  In satisfaction of "monthly practice expenses,"[2] including fees for "professional services."[3]

b.  In satisfaction of the "service fee" charged by SMI. The "service fee" was 66 percent[4] of all "net monthly collections."[5] SMI was given authority to draft its service fee from the Barrett PA's Depository Account each month.

c.  All remaining amounts were held in trust by SMI and to be returned to the Barrett PA.

## D.  The surgical centers & their structure

57.    Associated with each of the Barrett PAs is a surgical center where the physicians employed by the respective Barrett PAs would perform surgeries. The surgical centers were all owned by a limited liability company which has various D/B/As associated with the particular surgical centers in the various cities where the Barrett PAs operate. Thus, associated with the Barrett PAs were the following surgical centers:

---

[2] "Monthly practice expenses" were defined as expenses that are the sole obligations of the Barrett PA pursuant to generally accepted accounting principles, including salaries paid to physicians and others, taxes, insurance, and other items specifically designated as practices expenses in the management services agreement.

[3] "Professional services" are defined as third-party providers of legal, accounting, or other professional services on behalf of the Barrett PA.

[4] This fee includes 8% "in consideration of the billing and collection services" and 58% "in consideration of the general management and administrative services, personnel, facility and equipment provided."

[5] "Net monthly collections" are defined as the gross amount of all cash collected each month, less any amounts reimbursed to any patients or third-party payers.

| Barrett PA | Surgical Center |
|---|---|
| Stephen Barrett, DPM, Austin, PA | Allied Center for Special Surgery, Austin, LLC d/b/a St. Michael's Center for Special Surgery, Austin |
| Stephen Barrett, DPM, DFW, PA | Allied Center for Special Surgery, DFW, LLC d/b/a St. Michael's Center for Special Surgery, Dallas |
| Stephen Barrett, DPM, San Antonio, PA | Allied Center for Special Surgery, San Antonio, LLC d/b/a St. Michael's Center for Special Surgery, San Antonio |
| Barrett Foot & Ankle, P.C. | Allied Center for Special Surgery, Las Vegas, LLC d/b/a St. Michael's Center for Special Surgery, Las Vegas |
| Barrett Foot and Ankle Centers, Phoenix, LLC | Allied Center for Special Surgery, Scottsdale, LLC d/b/a St. Michael's Center for Special Surgery, Phoenix |

58.     Each of the "Allied Center for Special Surgery" surgical centers were managed and controlled by Brown, individually.

59.     Each of these "Allied Centers for Special Surgery"/"St. Michael's Centers for Special Surgery" was, in turn, owned by:

a.   M.G. Brown Investment Group, LLC ("**MGBIG**") – 1 percent. At all relevant times, MGBIG was owned exclusively by Defendant, Brown, and

b.   An entity known as "Brown Partners" – 99 percent. The Brown Partners entities were:

(1)   Brown Partners, Austin, LLC,

(2)   Brown Partners, DFW, LLC,

(3)   Brown Partners, San Antonio, LLC,

(4)   Brown Partners, Las Vegas, LLC, and

(5)   Brown Partners, Scottsdale, LLC

60.    Each of the "Brown Partners" entities were structured with the following owner-ship:

a.  M.G. Brown International, LLC ("MGBI") – 51 percent. At all relevant times, MGBI was owned exclusively by Defendant, Brown.

b.  A "Brown Executive Partners" entity – typically 14–16 percent. The Brown Executive Partners entities were:

(1)  Brown Executive Partners, Austin, LLC,

(2)  Brown Executive Partners, DFW, LLC,

(3)  Brown Executive Partners, San Antonio, LLC,

(4)  Brown Executive Partners, Las Vegas, LLC, and

(5)  Brown Executive Partners, Scottsdale, LLC

c.  A "Brown Employees Group" entity – 1 percent. Each of the "Brown Employees Group" entities are 100 percent owned by MGBI. The Brown Employees Group entities were:

(1)  Brown Employees Group, Austin, LLC,

(2)  Brown Employees Group, DFW, LLC,

(3)  Brown Employees Group, San Antonio, LLC,

(4)  Brown Employees Group, Las Vegas, LLC, and

(5)  Brown Employees Group, Scottsdale, LLC

d.  A "Brown Surgical Investments" entity – typically 32–34 percent. The Brown Surgical Investments entities were:

(1)  Brown Surgical Investments, Austin, LLC,

(2)  Brown Surgical Investments, DFW, LLC,

(3)  Brown Surgical Investments, San Antonio, LLC,

(4)  Brown Surgical Investments, Las Vegas, LLC, and

(5)  Brown Surgical Investments, Scottsdale, LLC

61.    Each of the "Brown Surgical Investments" entities were structured with the following ownership:

a.    MGBI – 51 percent,

b.    A "Brown Surgical Investments Partners" entity owning 49 percent. The associated Brown Surgical Investments Partners entities were:

    (1)    Brown Surgical Investments Partners, Austin, LLC,

    (2)    Brown Surgical Investments Partners, DFW, LLC,

    (3)    Brown Surgical Investments Partners, San Antonio, LLC,

    (4)    Brown Surgical Investments Partners, Las Vegas, LLC, and

    (5)    Brown Surgical Investments Partners, Scottsdale, LLC

The physicians who are employed by the respective Barrett PAs owned the membership interests in the respective Brown Surgical Investments Partners entities. It is this ownership group where Drs. Barrett, Singleton, and Ledesma maintained their interests, especially in the DFW and Scottsdale entities.

62.    Throughout three tiers in a hierarchical ownership structure, Defendant, Brown, maintained management and operation control, either individually or through entities exclusively owned by him.

63.    The surgical centers, with Brown as the control person on both sides of each alleged respective "license agreement," entered into "license agreements" with M.G. Brown Investment Group, LLC ("*MGBIG*"), presumably because the name "St. Michael" would be synonymous for Brown, rather than a saint, a church, Saint Michael, the Archangel. Apparently the surgical centers have paid a 15 percent intellectual property "IP" license out of their monthly cash collections.

64.    The surgical centers, with Brown as the control person on both sides of the transactions, entered management services contracts with SMI. Under these agreements, SMI agreed

to provide practice management, administrative, and support functions to enable the surgical

centers to provide facilities and equipment for the physicians employed by the Barrett Foot and

Ankle Centers to perform surgical procedures on the physicians' patients. Specifically, SMI

agreed to provide the surgical centers with facilities, equipment, supplies, and support services

necessary for the surgical centers to function. In addition, SMI is responsible for billing, collec-

tion, and making distributions as provided in the agreement. All billings, collections of the surgi-

cal centers' receivables, and management of the surgical centers' cash were contractually as-

signed to SMI. SMI was also required to provide all utilities and related services to ensure that

the surgical centers and their physicians are able to treat their patients at the provided facilities.

The management services agreements provided, in part:

> In connection with the billing, collection and cash management services to be pro-
> vided hereunder, . . . Surgery Center hereby grants to [SMI] an exclusive special
> power of attorney and appoints [SMI] as Surgery Center's exclusive true and law-
> ful agent and attorney-in-fact, and [SMI] hereby accepts such special power of at-
> torney and appointment, for the following purposes:
>
> > . . . To bill Surgery Center's patients, in Surgery Center's name and on
> > Surgery Center's behalf . . .
> >
> > . . . To bill, in Surgery Center's name and on Surgery Center's behalf, all
> > claims for payment, reimbursement or indemnification from Blue
> > Cross/Blue Shield, insurance companies, Medicare, Medicaid, and all oth-
> > er third-party payors or fiscal intermediaries . . .
> >
> > . . . [T]o collect and receive, in Surgery Center's name and on Surgery
> > Center's behalf, all Accounts Receivable . . . and to administer such ac-
> > counts at its reasonable discretion on Surgery Center's behalf . . .
> >
> > . . . To take possession of, and endorse in the name of the Surgery Center,
> > solely for deposit into the Surgery Center Account or into the Depository
> > Account . . . any notes, checks, money orders, insurance payments and any
> > other instruments received as payment for Ambulatory Surgical Center
> > Services.

... To sign checks, drafts, bank notes or other instruments on behalf of Surgery Center, and to make withdrawals from the Depository Account for payments specified in this Agreement or as requested from time to time by Surgery Center.

65.     SMI's contractual fee for these services was the lesser of:

a.   50 percent of cash collections, or

b.   118 percent the cost of management.

66.     In addition to the "intellectual property" fee due to MGBIG and the management fee to SMI, Brown also caused each surgical center to pay 10 percent of gross cash collections to SMI, allegedly as a return of capital contributions made by SMI.

67.     After the above fees and payments were made, SMI was required to pay all remaining cash to the owners of the surgical centers, where the monies would trickle-down through the layers of ownership, ultimately to the Plaintiffs who owned equity interests in the various Brown Surgical Investments Partners Entities. Profits from the surgical centers were supposed to flow to Drs. Barrett, Singleton, and Ledesma based on the respective percentages of ownership described more fully in Paragraphs 100. through 138., *infra*.

68.     Under the various LLC agreements, quarterly distributions were due approximately 15 days after each quarter's end. However,

69.     With Brown, MGBIG, and/or MGBI in full and complete control over all finances of the various entities described in Paragraphs 100. through 138., *infra*, Brown was able to finance much of his well-documented, lavish lifestyle, resulting in virtually no distributions or profits to the physicians owning part of the various Brown Surgical Investments entities.

70.    The Barrett PAs employed physicians who provided medical treatment to patients at various surgery centers, which were associated with Brown and SMI. For patients whose treatment required surgery, the patient would receive two bills:

    a. One bill from the relevant Barrett PA—for the treating physician's portion of the medical services, and

    b. A second bill from the associated surgical center.

At all times, the bills were prepared and mailed to patients and/or third-party payers by SMI.

### E. At the direction of Brown, BHCF and SMI acted beyond the scope of their authority under the controlling agreements and threatened the medical practices of the Barrett Foot & Ankle Centers and their Physicians

71.    Even though the Franchise Agreements and the Management Services Agreements provide that the Barrett Foot & Ankle Centers were independent contractors and solely responsible for the conduct of their medical practices and treatment of their patients, BHCF and SMI violated the express terms of the Franchise Agreements and Management Services Agreements by interfering with patient treatment, jeopardizing the Barrett Foot & Ankle Centers' medical practices.

72.    Specifically, Brown, SMI, and BHCF have altered the Plaintiff Physician's computer access codes and passwords, thereby locking them out of their computers, clinical databases, and electronic medical records that are an integral part of providing treatment for patients. Personnel and staff hired by SMI to assist the Plaintiff Physicians have been provided the access codes with strict instructions to limit the Plaintiff Physicians' access to their patients' medical records. The consequences of such actions are substantial. For instance, if a patient were to contact one of the Plaintiff Physicians for emergency assistance and the physician was unable to access the patient's records for information such as drug allergies and a current list of medications,

the physician may be unable to safely treat the patient if additional medications are required. Such interference with the Plaintiff Physicians' ability to treat the patients is in direct contravention of the controlling agreements between the parties and constitutes a reprehensible violation of the physician–patient relationship.

73.    In addition, SMI has directed its staff not to report to work at the Barrett Foot & Ankle Centers for the week beginning February 6, 2012. Without critical, support staff at the medical practices, the Plaintiff Physicians' ability to practice medicine and effectively treat their patients was materially impaired.

74.    SMI also unilaterally adjusted the fees charged for medical services provided by the Barrett Foot & Ankle Centers and their Physicians. SMI's unilateral adjustment of the fees was in direct contravention of the express terms of the Management Services Agreements and has resulted in gross overbillings of the Barrett Foot & Ankle Centers' patients. For example, SMI unilaterally adjusted fees to over $70,000 for surgical procedures that the Barrett Foot & Ankle Centers' Physicians determined should be billed at around $8,000.

75.    SMI expressly agreed not to interfere with the exercise of medical judgment or be involved in the care or treatment of patients. However, SMI repeatedly instructed its staff to disregard or refuse instructions from the Barrett Foot & Ankle Centers and their Physicians regarding the scheduling of medical procedures and other aspects of patient care. Such actions compromised the quality of medical care provided by the Barrett Foot & Ankle Centers and their physicians.

76.    SMI and BHCF also interfered with the Plaintiff Physicians' decisions regarding when, and where, patient surgeries took place. For example, SMI and BHCF encouraged certain

Plaintiff Physicians to perform surgery at a St. Michael's Center for Specialty Surgery rather than at other suitable facilities chosen under the physician's sole discretion. Notably, Brown, either directly or through other entities in which Brown has control, has a significant ownership interest in the St. Michael's Center for Specialty Surgery, which has a history of systematically overbilling patients. Thus, Brown, SMI, and BHCF's financial interests motivated their attempt to require the Plaintiff Physicians to perform surgeries at a St. Michael's Center of Specialty Surgery. Similarly, SMI and BHCF dictated the days on which the Plaintiff Physicians could perform surgeries in violation of the Franchise Agreements and Management Services Agreements. Nothing in the controlling agreements between the parties permitted SMI or BHCF to interfere with, or make medical decisions, concerning the treatment of the Barrett Foot & Ankle Centers' and the Plaintiff Physicians' patients.

77.    Upon information and belief, SMI, at the direction of Brown, made unauthorized distributions of money, collected under the Management Services Agreements, to Brown for his personal use under the guise of "business expenses" and/or "perks." Such distributions resulted in a reduction in the amount of distributions made by SMI to the Barrett Foot & Ankle Centers and diluted the funds in the depository accounts that were to be used for the operation and maintenance of the medical practices. In fact, at a recent hearing in the 309th District Court of Harris County, Texas, which concerns divorce proceedings between Brown and his current wife, Rachel Brown, Chuck Cave, the Chief Financial Officer of several of the entities under the control or direction of Brown, cited the Fifth Amendment and refused to answer questions regarding whether Brown manipulated or directed the manipulation of the flow of money through certain entities, resulting in the disbursement of substantial monies for his personal use.

## F.   Call Options

78.     In late 2011, Dr. Barrett started asking SMI's personnel about incidents of over-billing of patients. These inquiries followed the complaints raised by patients of the Barrett Foot and Ankle Centers. SMI, at Brown's direction, began the process of freezing-out the Plaintiffs and withholding distributions due to them via the Barrett PAs.

79.     Under Brown's direction, BHCF terminated the franchise agreements in early 2012. At the same time, BHCF, through a strained interpretation of the franchise agreements, attempted to exercise "call options" in the franchise agreements in an effort to divest Dr. Barrett of his stock in the Barrett PAs as well as his membership interests in Barrett Foot and Ankle Centers,Phoenix, LLC. However, nothing in the franchise agreements allowed for such action. None-theless, since the time the franchise agreements were terminated, BHCF and SMI have acted as if there never were any management services agreements or franchise agreements.

80.     In particular, after the termination of the franchise agreements, third-party payers, such as Medicare, Medicaid, and insurance companies, continued to pay down the Barrett PAs' receivables, and SMI continued to sweep all cash out of the Barrett PAs' depository accounts. While these accounts were actually owned by the Barrett PAs.

81.     After allegedly paying those expenses and other charges that it should have paid under the management services agreements and franchise agreements, SMI failed to return any profits to the Barrett PAs, much less account for them.

## G.   Derivative Proceedings on Behalf of "Brown Surgical Investments Partners" Entities

82.     The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

83.    Dr. Barrett is a member owning an equity interest in the following:

a.   Brown Surgical Investments Partners, Austin, LLC

b.   Brown Surgical Investments Partners, Las Vegas, LLC

c.   Brown Surgical Investments Partners, San Antonio, LLC

All of these companies are closely-held companies under TEX. BUS. ORGS. CODE ANN. § 101.463.

84.    Drs. Barrett and Singleton are members owning an equity interest in Brown Surgical Investments Partners, DFW, LLC, a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463.

85.    Drs. Barrett and Ledesma are members owning an equity interest in Brown Surgical Investments Partners, Scottsdale, LLC, a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463.

## H.   Intellectual property licensing agreement with Instratek, Inc.

86.    Instratek, Inc. is a company that manufactures and sells patented medical instruments. Some of these patented medical instruments are instruments used in hand surgeries, which were patented by Brown. Others are for patents on instruments used in foot surgeries, in which Dr. Barrett and Brown are listed as co-inventors.

87.    The Instratek surgical instruments are sold to the surgical centers described in this Petition, and they are also sold to third-parties.

88.    Dr. Barrett had a contract with Instratek, Inc. where Instratek, Inc. was allowed to use Dr. Barrett's intellectual property. Instratek, Inc. breached the agreement by failing to pay Dr. Barrett contracted for royalties. As a result, Dr. Barrett has been damaged in an amount in excess of the minimum jurisdictional limit of this Court.

## V.

## Causes of Action

### A.  Breaches of formal fiduciary duties owed to the Barrett PAs

89.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

90.    Each management services agreement appointed SMI as the ***agent and attorney-in-fact*** for each Barrett PA and appointed SMI as trustee for each Barrett PA over funds in the Depository Accounts. Pursuant to each management services agreement, SMI held and managed the funds in the Barrett PA's Depository Accounts in trust and for the benefit of the Barrett PA. Moreover, Brown had sole and exclusive rights to manage, operate, and control SMI. Therefore, as with SMI, Brown owed a fiduciary duty to each Barrett PA. SMI and Brown owed each Barrett PA:

a.  a duty of loyalty and utmost good faith,

b.  a duty of candor,

c.  a duty to refrain from self-dealing,

d.  a duty to act with integrity of the strictest kind,

e.  a duty of fair and honest dealing, and

f.  a duty of full disclosure.

91.    SMI and Brown breached their fiduciary duties by mismanaging the funds in the Barrett PAs' Depository Accounts and diverting the funds for Brown's personal use and enjoyment under the guise of paying operating expenses of the Barrett PAs. The operating expenses and professional fees SMI claims to have paid were grossly inflated, fabricated, duplicated, contrived, and fraudulent. In fact, in one instance, during a proceeding in the 309th District Court of

Harris County, Texas, Chuck Cave, the Chief Financial Officer of SMI and several other entities under Brown's control, invoked the Fifth Amendment and refused to answer questions regarding whether Brown manipulated or demanded the manipulation of the flow of money through certain entities, resulting in the disbursement of funds for his personal use. In short, SMI and Brown fabricated operating expenses and professional fees in order to divert the Barrett PA's cash collections to Brown and/or business entities under Brown's control. Moreover, SMI and Brown have wholly failed and refused to provide an accounting of the receipts and disbursements out of the Barrett PAs' Depository Accounts.

92.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, the Barrett PAs have suffered actual damages while the Defendants have wrongfully enjoyed the benefits of monies which they were not entitled.

93.     The Barrett PAs are entitled to recover actual economic damages, including out-of-pocket expenses and lost profits. As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Plaintiffs have sustained a loss of profits in excess of the minimum jurisdictional limits of this Court.

94.     Additionally, the Court should order all fees collected by the Defendants to be disgorged and paid to each of the respective Barrett PAs.

95.     The Plaintiffs should be awarded reasonable and necessary attorneys' fees.

96.     The Defendants' breaches of their fiduciary duties were intentional and with malice. Therefore, the Plaintiffs are also entitled to recover exemplary damages.

**B.  Breaches of fiduciary duties – Brown Surgical Investments Partners Entities**

97.     The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

*1.   The city-focused surgical center groups*

98.     In various cities, Brown established surgical centers where the Barrett Foot and Ankle Centers would perform surgeries. These surgical centers were established with monies swept out of the Barrett Foot and Ankle Centers' depository accounts.

99.     In every city were a surgery center was established, Brown organized a hierarchical web of companies designed to dilute the promised profits that would accrue to the physicians. In each city, the pattern of Brown's manipulation and control was substantially the same, despite minor differences in ownership by the various equity membership groups.

*a.   Brown Surgical Investments Partners, Austin, LLC & its relationship to Allied Center for Special Surgery, Austin, LLC*

100.    Brown Surgical Investments Partners, Austin, LLC has two classes of stock/membership interests:

a.  Class A, which comprises 90 percent of the voting equity. Of this class, Dr. Barrett owns 5 percent, making his total voting equity in the company equivalent to 4.5 percent. In all, there are 11 members in Class A, including Dr. Barrett.

b.  Class B, which comprises 10 percent of the voting equity. In all, there are 7 members in Class B.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 49 percent interest in Brown Surgical Investments, Austin, LLC.

101.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Surgical Investments Partners, Austin, LLC to pursue claims that were sustained by Brown Surgical Investments Partners, Austin, LLC. Moreover, because Brown Surgical Investments Partners, Austin, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

102.    Brown Surgical Investments, Austin, LLC, has two members:

a.  Brown Surgical Investments Partners, Austin, LLC, owning 49 percent. Through his membership in Brown Surgical Investments Partners, Austin, LLC, Dr. Barrett has a beneficial equity interest of 2.205 percent.

b.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 31 percent interest in Brown Partners, Austin, LLC.

103.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Surgical Investments, Austin, LLC to pursue claims that were sustained by Brown Surgical Investments, Austin, LLC. Moreover, because Brown Surgical Investments, Austin, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

104.    Brown Partners, Austin, LLC, has four members:

a.  Brown Surgical Investments, Austin, LLC, owning 31 percent. Through his membership in Brown Surgical Investments Partners, Austin, LLC and his indirect membership interest in Brown Surgical Investments, Austin, LLC, Dr. Barrett has a beneficial equity interest of 0.684 percent.

b.  Brown Employees Group, Austin, LLC, owning 1 percent.

c.  Brown Executive Partners, Austin, LLC, owning 17 percent.

    d.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity in-

terest in the company. The company's sole, long-term asset is a 99 percent interest in Allied

Center for Special Surgery, Austin, LLC d/b/a St. Michael's Center for Special Surgery, Austin.

    105.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of

Brown Partners, Austin, LLC to pursue claims that were sustained by Brown Partners, Austin,

LLC. Moreover, because Brown Partners, Austin, LLC, is a closely-held company under TEX.

BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as

direct actions.

    106.    Allied Center for Special Surgery, Austin LLC has two members:

    a.  Brown Partners, Austin, LLC, owning 99 percent. Through his membership in
        Brown Surgical Investments Partners, Austin, LLC and his indirect member-
        ship in Brown Surgical Investments, Austin, LLC, and indirect membership in
        Brown Partners, Austin, LLC, Dr. Barrett has a beneficial equity interest of
        0.667 percent.

    b.  MGBIG, owning 1 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity in-

terest in the company.

    107.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of

Allied Center for Special Surgery, Austin, LLC to pursue claims that were sustained by Allied

Center for Special Surgery, Austin, LLC. Moreover, because Allied Center for Special Surgery,

Austin, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice

requires that these causes of action be maintained as direct actions.

### b.   Brown Surgical Investments Partners, Las Vegas, LLC & its relationship to Allied Center for Special Surgery, Las Vegas, LLC

108.   Brown Surgical Investments Partners, Las Vegas, LLC has two classes of stock/membership interests:

a. Class A, which comprises 90 percent of the voting equity. Of this class, Dr. Barrett owns 5 percent, making his total voting equity in the company equivalent to 4.5 percent. In all, there are 11 members in Class A, including Dr. Barrett.

b. Class B, which comprises 10 percent of the voting equity. In all, there are 7 members in Class B.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 49 percent interest in Brown Surgical Investments, Las Vegas, LLC.

109.   Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Surgical Investments Partners, Las Vegas, LLC to pursue claims that were sustained by Brown Surgical Investments Partners, Las Vegas, LLC. Moreover, because Brown Surgical Investments Partners, Las Vegas, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

110.   Brown Surgical Investments, Las Vegas, LLC, has two members:

a. Brown Surgical Investments Partners, Las Vegas, LLC, owning 49 percent. Through his membership in Brown Surgical Investments Partners, Las Vegas, LLC, Dr. Barrett has a beneficial equity interest of 2.205 percent.

b. MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 31 percent interest in Brown Partners, Las Vegas, LLC.

111.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Surgical Investments, Las Vegas, LLC to pursue claims that were sustained by Brown Surgical Investments, Las Vegas, LLC. Moreover, because Brown Surgical Investments, Las Vegas, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

112.    Brown Partners, Las Vegas, LLC, has four members:

a.  Brown Surgical Investments, Las Vegas, LLC, owning 33 percent. Through his membership in Brown Surgical Investments Partners, Las Vegas, LLC and his indirect membership interest in Brown Surgical Investments, Las Vegas, LLC, Dr. Barrett has a beneficial equity interest of 0.728 percent.

b.  Brown Employees Group, Las Vegas, LLC, owning 1 percent.

c.  Brown Executive Partners, Las Vegas, LLC, owning 17 percent.

d.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 99 percent interest in Allied Center for Special Surgery, Las Vegas, LLC d/b/a St. Michael's Center for Special Surgery, Las Vegas.

113.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Partners, Las Vegas, LLC to pursue claims that were sustained by Brown Partners, Las Vegas, LLC. Moreover, because Brown Partners, Las Vegas, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

114.    Allied Center for Special Surgery, Las Vegas LLC has two members:

a.  Brown Partners, Las Vegas, LLC, owning 99 percent. Through his membership in Brown Surgical Investments Partners, Las Vegas, LLC and his indirect

membership in Brown Surgical Investments, Las Vegas, LLC, and indirect membership in Brown Partners, Las Vegas, LLC, Dr. Barrett has a beneficial equity interest of 0.720 percent.

b. MGBIG, owning 1 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company.

115.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Allied Center for Special Surgery, Las Vegas, LLC to pursue claims that were sustained by Allied Center for Special Surgery, Las Vegas, LLC. Moreover, because Allied Center for Special Surgery, Las Vegas, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

### c. *Brown Surgical Investments Partners, San Antonio, LLC & its relationship to Allied Center for Special Surgery, San Antonio, LLC*

116.    Brown Surgical Investments Partners, San Antonio, LLC has two classes of stock/membership interests:

a. Class A, which comprises 90 percent of the voting equity. Of this class, Dr. Barrett owns 5 percent, making his total voting equity in the company equivalent to 4.5 percent. In all, there are 11 members in Class A, including Dr. Barrett.

b. Class B, which comprises 10 percent of the voting equity. In all, there are 7 members in Class B.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 49 percent interest in Brown Surgical Investments, San Antonio, LLC.

117.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Surgical Investments Partners, San Antonio, LLC to pursue claims that were sustained by

Brown Surgical Investments Partners, San Antonio, LLC. Moreover, because Brown Surgical Investments Partners, San Antonio, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

118.    Brown Surgical Investments, San Antonio, LLC, has two members:

a.  Brown Surgical Investments Partners, San Antonio, LLC, owning 49 percent. Through his membership in Brown Surgical Investments Partners, San Antonio, LLC, Dr. Barrett has a beneficial equity interest of 2.205 percent.

b.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 31 percent interest in Brown Partners, San Antonio, LLC.

119.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Surgical Investments, San Antonio, LLC to pursue claims that were sustained by Brown Surgical Investments, San Antonio, LLC. Moreover, because Brown Surgical Investments, San Antonio, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

120.    Brown Partners, San Antonio, LLC, has four members:

a.  Brown Surgical Investments, San Antonio, LLC, owning 31 percent. Through his membership in Brown Surgical Investments Partners, San Antonio, LLC and his indirect membership interest in Brown Surgical Investments, San Antonio, LLC, Dr. Barrett has a beneficial equity interest of 0.684 percent.

b.  Brown Employees Group, San Antonio, LLC, owning 1 percent.

c.  Brown Executive Partners, San Antonio, LLC, owning 17 percent.

d.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 99 percent interest in Allied Center for Special Surgery, San Antonio, LLC d/b/a St. Michael's Center for Special Surgery, San Antonio.

121.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Brown Partners, San Antonio, LLC to pursue claims that were sustained by Brown Partners, San Antonio, LLC. Moreover, because Brown Partners, San Antonio, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

122.    Allied Center for Special Surgery, San Antonio LLC has two members:

a.  Brown Partners, San Antonio, LLC, owning 99 percent. Through his membership in Brown Surgical Investments Partners, San Antonio, LLC and his indirect membership in Brown Surgical Investments, San Antonio, LLC, and indirect membership in Brown Partners, San Antonio, LLC, Dr. Barrett has a beneficial equity interest of 0.677 percent.

b.  MGBIG, owning 1 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company.

123.    Dr. Barrett brings causes of action both individually and derivatively, on behalf of Allied Center for Special Surgery, San Antonio, LLC to pursue claims that were sustained by Allied Center for Special Surgery, San Antonio, LLC. Moreover, because Allied Center for Special Surgery, San Antonio, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

### d.  *Brown Surgical Investments Partners, DFW, LLC & its relationship to Allied Center for Special Surgery, DFW, LLC*

124.    Brown Surgical Investments Partners, DFW, LLC has two classes of stock/membership interests:

a.  Class A, which comprises 90 percent of the voting equity. Of this class, Dr. Barrett owns 5 percent, making his total voting equity in the company equivalent to 4.5 percent. Dr. Singleton owns 8 percent, making his total voting equity in the company 7.2 percent. In all, there are 11 members in Class A, including Dr. Barrett and Dr. Singleton.

b.  Class B, which comprises 10 percent of the voting equity. In all, there are 7 members in Class B.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 49 percent interest in Brown Surgical Investments, DFW, LLC.

125.    Drs. Barrett and Singleton bring causes of action both individually and derivatively, on behalf of Brown Surgical Investments Partners, DFW, LLC to pursue claims that were sustained by Brown Surgical Investments Partners, DFW, LLC. Moreover, because Brown Surgical Investments Partners, DFW, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

126.    Brown Surgical Investments, DFW, LLC, has two members:

a.  Brown Surgical Investments Partners, DFW, LLC, owning 49 percent. Through his membership in Brown Surgical Investments Partners, DFW, LLC, Dr. Barrett has a beneficial equity interest of 2.205 percent, and Dr. Singleton has a beneficial equity interest of 3.528 percent.

b.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 31 percent interest in Brown Partners, DFW, LLC.

127.    Drs. Barrett and Singleton bring causes of action both individually and derivatively, on behalf of Brown Surgical Investments, DFW, LLC to pursue claims that were sustained by Brown Surgical Investments, DFW, LLC. Moreover, because Brown Surgical Investments, DFW, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

128.    Brown Partners, DFW, LLC, has four members:

a. Brown Surgical Investments, DFW, LLC, owning 31 percent. Through his membership in Brown Surgical Investments Partners, DFW, LLC and his indirect membership interest in Brown Surgical Investments, DFW, LLC, Dr. Barrett has a beneficial equity interest of 0.728 percent, and Dr. Singleton has a beneficial equity interest of 1.164 percent.

b. Brown Employees Group, DFW, LLC, owning 1 percent.

c. Brown Executive Partners, DFW, LLC, owning 17 percent.

d. MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 99 percent interest in Allied Center for Special Surgery, DFW, LLC d/b/a St. Michael's Center for Special Surgery, DFW.

129.    Drs. Barrett and Singleton bring causes of action both individually and derivatively, on behalf of Brown Partners, DFW, LLC to pursue claims that were sustained by Brown Partners, DFW, LLC. Moreover, because Brown Partners, DFW, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

130.     Allied Center for Special Surgery, DFW LLC has two members:

a.  Brown Partners, DFW, LLC, owning 99 percent. Through his membership in Brown Surgical Investments Partners, DFW, LLC and his indirect membership in Brown Surgical Investments, DFW, LLC, and indirect membership in Brown Partners, DFW, LLC, Dr. Barrett has a beneficial equity interest of 0.720 percent, and Dr. Singleton has a beneficial equity interest of 1.153 percent.

b.  MGBIG, owning 1 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company.

131.     Drs. Barrett and Singleton bring causes of action both individually and derivatively, on behalf of Allied Center for Special Surgery, DFW, LLC to pursue claims that were sustained by Allied Center for Special Surgery, DFW, LLC. Moreover, because Allied Center for Special Surgery, DFW, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

### e.     *Brown Surgical Investments Partners, Scottsdale, LLC & its relationship to Allied Center for Special Surgery, Scottsdale, LLC*

132.     Brown Surgical Investments Partners, Scottsdale, LLC has two classes of stock/membership interests:

a.  Class A, which comprises 90 percent of the voting equity. Of this class, Dr. Barrett owns 17 percent, making his total voting equity in the company equivalent to 15.3 percent. Dr. Ledesma owns 8 percent, making is total voting equity in the company 7.2 percent. In all, there are 11 members in Class A, including Dr. Barrett and Dr. Ledesma.

b.  Class B, which comprises 10 percent of the voting equity. In all, there are 7 members in Class B.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 49 percent interest in Brown Surgical Investments, Scottsdale, LLC.

133.    Drs. Barrett and Ledesma bring causes of action both individually and derivatively, on behalf of Brown Surgical Investments Partners, Scottsdale, LLC to pursue claims that were sustained by Brown Surgical Investments Partners, Scottsdale, LLC. Moreover, because Brown Surgical Investments Partners, Scottsdale, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

134.    Brown Surgical Investments, Scottsdale, LLC, has two members:

a.  Brown Surgical Investments Partners, Scottsdale, LLC, owning 49 percent. Through his membership in Brown Surgical Investments Partners, Scottsdale, LLC, Dr. Barrett has a beneficial equity interest of 7.497 percent, and Dr. Ledesma has a beneficial equity interest of 3.528 percent.

b.  MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 31 percent interest in Brown Partners, Scottsdale, LLC.

135.    Drs. Barrett and Ledesma bring causes of action both individually and derivatively, on behalf of Brown Surgical Investments, Scottsdale, LLC to pursue claims that were sustained by Brown Surgical Investments, Scottsdale, LLC. Moreover, because Brown Surgical Investments, Scottsdale, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

136.    Brown Partners, Scottsdale, LLC, has four members:

a. Brown Surgical Investments, Scottsdale, LLC, owning 31 percent. Through his membership in Brown Surgical Investments Partners, Scottsdale, LLC and his indirect membership interest in Brown Surgical Investments, Scottsdale, LLC, Dr. Barrett has a beneficial equity interest of 2.549 percent, and Dr. Ledesma has a beneficial equity interest of 1.996 percent.

b. Brown Employees Group, Scottsdale, LLC, owning 1 percent.

c. Brown Executive Partners, Scottsdale, LLC, owning 17 percent.

d. MGBI, owning 51 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company. The company's sole, long-term asset is a 99 percent interest in Allied Center for Special Surgery, Scottsdale, LLC d/b/a St. Michael's Center for Special Surgery, Scottsdale.

137.    Drs. Barrett and Ledesma bring causes of action both individually and derivatively, on behalf of Brown Partners, Scottsdale, LLC to pursue claims that were sustained by Brown Partners, Scottsdale, LLC. Moreover, because Brown Partners, Scottsdale, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

138.    Allied Center for Special Surgery, Scottsdale LLC has two members:

a. Brown Partners, Scottsdale, LLC, owning 99 percent. Through his membership in Brown Surgical Investments Partners, Scottsdale, LLC and his indirect membership in Brown Surgical Investments, Scottsdale, LLC, and indirect membership in Brown Partners, Scottsdale, LLC, Dr. Barrett has a beneficial equity interest of 2.523 percent, and Dr. Ledesma has a beneficial equity interest of 1.188 percent.

b. MGBIG, owning 1 percent.

Management in this company is vested in its sole manager, Brown, who has no direct equity interest in the company.

139.    Drs. Barrett and Ledesma bring causes of action both individually and derivative-ly, on behalf of Allied Center for Special Surgery, Scottsdale, LLC to pursue claims that were sustained by Allied Center for Special Surgery, Scottsdale, LLC. Moreover, because Allied Center for Special Surgery, Scottsdale, LLC, is a closely-held company under TEX. BUS. ORGS. CODE ANN. § 101.463, justice requires that these causes of action be maintained as direct actions.

## 2.    Management & Conflicts of Interest

140.    Each company in each hierarchical group of surgical centers was managed and controlled by Brown. As a manager with no direct ownership interest in any of the companies, Brown owed each company a fiduciary duty. As such Brown was required to deal with each company in the surgical center hierarchy with the utmost of good faith, candor, integrity, and honest dealing. Brown also had the duty to refrain from self-dealing, which extends to those companies in which he held a controlling interest.

141.    As a controlling intermediary between each St. Michael's surgical center, in which he was the sole manager, and MGBIG, in which he was the sole manager, Brown entered into a franchise agreement. While names like the "Brown Hand Center" or the "Barrett Foot and An-kle Center" certainly were prestigious brands at the time, the "St. Michael" name was not. The franchise agreement was not an agreement negotiated at arm's length. It was only a subterfuge to siphon 15 percent of the various surgical centers' net cash collections in order for Brown to fi-nance his lavish lifestyle.

142.    The purpose of the franchise agreement with MGBIG is more suspect since Brown delegated all administrative and management functions of each surgical center to SMI. As an intermediary between each St. Michael's surgical center, in which he was the sole manager, and SMI, in which he was the president, Brown entered into a management services agreement.

The agreement unburdened each surgical center from having to actually manage a business, leaving the surgical centers as passive landlords. The consideration for this was a fee of the lesser of:

    a.   50 percent of monthly, net cash collections, or

    b.   118 percent of the actual management costs.

In addition to these fees, Brown also required each surgical center to pay an additional 5 percent of its monthly, net cash collections to SMI, allegedly as a repayment of capital paid in to organize each surgical center.

143.    While Brown, as manager of each surgical center, arranged for the repayment of capital contributions to SMI in a related-party transaction where there were clear conflicts of interest, he was not as concerned about repaying capital contributions made by the physicians who also contributed to the organization of the particular surgical centers. These physicians were the members owning 90 percent of the equity interests in the respective "Brown Surgical Investments Partners" at the bottom of the equity ownership hierarchy that actually owned the associated surgical center.

144.    After SMI swept out all cash from the surgical centers' Depository Accounts, SMI proceeded to pay expenses, which included draws and bonuses to select employees. Then SMI would pay the franchise fee to MGBIG as well as all fees allegedly due to SMI for its services and recapture of capital contribuions.

145.    Upon information and belief, SMI manipulated purchasing and other expenses to allow the surgery centers to, in effect, subsidize the St. Michael's Center for Special Surgery, Ltd. This was the Houston surgical center, which was organized in a very different manner than the other surgical centers. It was organized as a limited partnership. Its general partner was a

Brown, owned and controlled entity, SMCSS, Inc., which owned a 1 percent interest. The remaining equity was held by two limited partners:

    a.  SMI, which owned 69 percent

    b.  St. Michael's Surgeon's Group, Ltd., which owned 30 percent

St. Michael's Surgeon's Group, Ltd. was another Brown-controlled entity in which Brown, indirectly, had a material ownership interest. Its general partner was SMCSS, Inc.—the same entity that was general partner of the surgical center. Its limited partners were:

    a.  Castlemane Farms, Inc., owning 39 percent, which was a Brown-owned and managed concern dealing with exotic animals.

    b.  The remaining 60 percent was actually owned by three doctors.

146.    Upon information and belief, SMI, at the direction of Brown, made unauthorized distributions of money, collected under the Management Services Agreements, to Brown for his personal use under the guise of business expenses and/or "perks." Such distributions resulted in a reduction in the amount of distributions made by SMI to the ownership hierarchy of each surgical center and diluted the funds in the depository accounts that were to be used for the operation and maintenance of the surgical centers. In fact, at a recent hearing in the 309th District Court of Harris County, Texas, which concerns divorce proceedings between Brown and his current wife, Rachel Brown, Chuck Cave, the Chief Financial Officer of several of entities under the control or direction of Brown, cited the Fifth Amendment and refused to answer questions regarding whether Brown manipulated or directed the manipulation of the flow of money through certain entities, resulting in the disbursement of substantial monies for his personal use.

147.    By virtue of Brown's control over the "Brown Surgical Investments" entities, "Brown Partners" entities, and the surgical centers, Brown and the entities he exclusively owns

and controls, MGBIG and MGBI, owe Drs. Barrett, Singleton, and Ledesma fiduciary duties, which he has breached. Brown, MGBIG, and MGBI owed Drs. Barrett, Singleton, and Ledesma the duty to exercise his powers, as the head of the Brown empire, solely for the benefit of the companies and their members, including Drs. Barrett, Singleton, and Ledesma.

148.    Brown and the entities he exclusively owns and controls, MGBIG, and MGBI, have breached these duties. Specifically, but without limitation, Brown, MGBI, and MGBIG have engaged in deception and self-dealing by using the Brown empire, including without limitation, MGBIG to fund his extravagant lifestyle.

149.    These breaches have damaged the Plaintiffs in an amount exceeding the minimum jurisdictional limits of this Court.

150.    Because Brown's acts were done intentionally, fraudulently, and with malice, Brown, MGBIG, and MGBI are also liable for exemplary damages.

151.    The Plaintiffs are entitled to recover actual economic damages, including out-of-pocket expenses and lost profits. As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Plaintiffs sustained a loss of profits in excess of the minimum jurisdictional limits of this Court.

152.    Additionally, the Court should order all fees collected by the Defendants to be disgorged and paid to the respective Plaintiffs in an amount and in such manner as the Court deems just.

153.    Drs. Barrett, Singleton, and Ledesma have standing to sue individually and derivatively on behalf of Brown Surgical Investments Partners, Austin, LLC; Brown Surgical Investments Partners, DFW, LLC; Brown Surgical Investments Partners, San Antonio, LLC; and

Brown Surgical Investments Partners, Scottsdale, LLC because the manager of these companies—Brown—has refused, and refuses, to pursue these claims on behalf of the companies. They have further standing to pursue these claims up through the hierarchy of ownership to the respective "St. Michael's" surgery centers. Since, all of these entities are closely-held Texas limited liability companies, this Court should allow a direct recovery to the Plaintiffs in the interest of justice.  Because Brown is not a member of any Brown Surgical Investments Partners entity, Brown should not be a beneficiary, either directly or indirectly, of any awarded damages.

154.    The Plaintiffs should be awarded reasonable and necessary attorneys' fees.

155.    The Defendants' breaches of their fiduciary duties were intentional and with malice. Therefore, the Plaintiffs are entitled to recover exemplary damages.

## C.  Shareholder Oppression

156.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

157.    The acts of Brown, MGBIG, and MGBI constitute shareholder oppression. In particular, by manipulating expenses and diverting profits into Brown's own pocket and failing to account for even legitimate expenses and fees incurred by the surgical centers, and by failing to distribute profits from the surgical centers through the Brown-controlled hierarchy of subsidiaries that formed the ownership structure of the surgical centers, the Defendants oppressed the minority shareholders such as the Plaintiffs. This defeated the Plaintiffs' expectations, as minority members in the various surgical centers, that objectively viewed, were both reasonable under the circumstances and central to the Plaintiffs' decision to be equity members in the surgical centers.

158.    Alternatively, the Defendants engaged in burdensome, harsh, or wrongful con-
duct, departing from the standards of fair dealing, violating the standards of conduct upon which
minority, equity members could reasonably rely.

159.    Due to the Defendants' oppressive conduct, the Plaintiffs are entitled to equitable
relief, including, but not limited to, an accounting of all funds paid to Brown and/or his con-
trolled entities, disgorgement of all fees charged by SMI, BHCF, Brown and/or Brown-
controlled entities. Additionally, the Plaintiffs are entitled to a constructive trust over the proper-
ty of the surgical centers, a "buy out" of their membership interests for fair value, and reim-
bursement of the Plaintiffs' capital contributions.

## D.   Breach of Contract – Instratek

160.    The factual allegations above are incorporated herein for all purposes as if fully set
forth at length.

161.    Instratek, Inc. is a company that manufactures and sells patented medical instru-
ments. Some of these patented medical instruments are instruments used in hand surgeries,
which were patented by Brown. Others are for patents on instruments used in foot surgeries, in
which Dr. Barrett and Brown are listed as co-inventors.

162.    In exchange for granting Instratek, Inc. a license to use those patents in which Dr.
Barrett holds an interest, Instratek, Inc. agreed to give Dr. Barrett a royalty which is based on the
sales generated by instruments employing Dr. Barrett's license. This royalty is a minimum of
$65,000 per year.

163.    The Instratek surgical instruments are sold to the surgical centers described in this
Petition, and they are also sold to third-parties.

164.    Instratek, Inc. has breached its royalty agreement by not paying royalties to Dr. Barrett, yet it continues to enjoy the benefit of selling surgical instruments in which Dr. Barrett has granted a license for the use of his intellectual property. Accordingly, Dr. Barrett has been damaged in an amount exceeding the minimum jurisdictional limits of this Court. In addition to actual damages, Dr. Barrett is entitled to an award of reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE ch. 38.

165.    As a result, Dr. Barrett has been damaged in an amount exceeding the minimum jurisdictional limits of this Court.

166.    Plaintiff further requests an award of reasonable and necessary attorney's fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## E.    Breach of Contract - SMI

167.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

168.    SMI entered into a series of contracts with the Barrett Foot & Ankle Centers called the Management Services Agreements.

169.    The Barrett Foot & Ankle Centers have fully performed their obligations under the Management Services Agreements.

170.    Under the Management Services Agreements, SMI agreed to:

a.  Provide the Barrett Foot & Ankle Centers with leased facilities and all equipment, supplies, and support services necessary for the Barrett Foot & Ankle Centers' medical practices;

b.  Provide all utilities and related services to ensure that the Barrett Foot & Ankle Centers and their physicians are able to treat their patients at the provided facilities;

c. Invoice Barrett Foot & Ankle Centers' patients at the rates solely determined by the Barrett Foot & Ankle Centers and the Plaintiff Physicians;

d. Make only authorized distributions of money collected from patients pursuant to the terms of the Management Services Agreements;

e. Not interfere with the medical, professional, and ethical aspects of the Barrett Foot & Ankle Centers' medical practices, including the admission of new patients and providing care to patients of the Barrett Foot & Ankle Centers and the Plaintiff Physicians;

f. Not to interfere with the exercise of medical judgment and not to be involved in the care or treatment of patients; and

g. Comply with all applicable law in the conduct of its obligations under the Management Services Agreements.

171.    In addition, SMI agreed that it has no authority to hire, terminate, or otherwise take any action whatsoever with respect to any physicians practicing medicine with the Barrett Foot & Ankle Centers.

172.    SMI materially breached the promises under the Management Services Agreements.

173.    SMI further breached its agreements by continuing to sweep all cash collections, following the termination of the management services agreements, from the Barrett PAs' depository accounts but failing to return, much less account for, any profits that were due to the Barrett PAs.

174.    As a result, the Barrett PAs have been damaged in an amount exceeding the minimum jurisdictional limits of this Court.

175.    Plaintiffs further request an award of reasonable and necessary attorney's fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## F.   Breach of Contract – BHCF

176.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

177.    The Brown Hand Center entered into a series of contracts with the Barrett Foot & Ankle Centers called the Franchise Agreements.

178.    The Barrett Foot & Ankle Centers have fully performed their obligations under the Franchise Agreements.

179.    Under the Franchise Agreements, BHCF agreed that:

a.   The Barrett Foot & Ankle Centers would be solely responsible for the day-to-day management and operation of their medical practices;

b.   The Brown Hand Center had no authority or right to control the Barrett Foot & Ankle Centers' medical practices in any way;

c.   The Barrett Foot & Ankle Centers would hire and maintain their own personnel, and would have exclusive supervision and control of such personnel;

d.   The Barrett Foot & Ankle Centers had the sole authority to set prices for the medical services their doctors provided to patients; and

e.   The Barrett Foot & Ankle Centers and their physicians were not employees of BHCF, but rather the Barrett Foot & Ankle Centers are independent contractors, and BHCF has no authority to terminate or interfere with the medical practices of any of the physicians working for the Barrett Foot & Ankle Centers.

180.    The Brown Hand Center has materially breached promises under the Franchise Agreements.

181.    As a result, the Barrett PAs have been damaged in an amount exceeding the minimum jurisdictional limits of this Court.

182.    Plaintiffs further request an award of reasonable and necessary attorney's fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## G. Tortious Interference with Contractual Relationships

183.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

184.    Drs. Barrett, Singleton, and Ledesma, had contractual relationships with their patients to provide medical treatment in exchange for fees to be determined by the treating physicians.

185.    Defendants, SMI, BHCF, and Brown, willfully and intentionally interfered with those contracts as well as their employment contracts with their respective employers—Barrett Foot & Ankle Centers, Phoenix, LLC; Stephen Barrett, DPM, DFW, PA.

186.    Defendants' interference has proximately caused Plaintiffs' injuries and damages in an amount exceeding the minimum jurisdictional limits of this Court.

187.    Because the Defendant's actions were the result of malice and/or fraud, the Plaintiffs are entitled to an award of exemplary damages.

## H.  Fraud and Civil Conspiracy

188.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

189.    BHCF and SMI, under the control and direction of Brown, have exploited their contractual relationships with the Barrett Foot & Ankle Centers to gain access to funds held in a depository account established solely for the benefit of the Barrett Foot & Ankle Centers.

190.    Brown and/or entities under his direct control or supervision, including BHCF and SMI, have conspired to manipulate and arbitrarily inflate the fees and expenses to be paid from the depository account to Brown and/or entities under his direct control or supervision.

191.    Brown, BHCF, and SMI have made material misrepresentations about the nature and amount of disbursements made from the depository account. In addition, Brown Hand Center and SMI, under the control and direction of Brown, have conspired to manipulate and arbitrarily inflate the fees billed to and collected from The Barrett Foot & Ankle Centers' patients.

192.    Brown, BHCF, and SMI have made material representations concerning the amount of the bills sent to and collected from The Barrett Foot & Ankle Centers' patients.

193.    The foregoing representations made by Brown, BHCF, and SMI were false, and Brown, BHCF, and SMI knew the representations were false at the time they were made.

194.    Brown, BHCF, and SMI had a meeting of the minds and worked collaboratively to perpetuate their fraud on Barrett PAs and the Plaintiff Physicians.

195.    The Barrett PAs and the Plaintiff Physicians relied on the representations made by Brown, BHCF, and SMI. The Plaintiffs were damaged, in an amount exceeding the minimum jurisdictional limits of this Court, as a result.

196.    These acts have proximately caused Plaintiffs' injuries and damages in an amount exceeding the minimum jurisdictional limits of this Court.

197.    Because the Defendant's actions were the result of malice and/or fraud, the Plaintiffs are entitled to an award of exemplary damages.

I.    **Alter-ego**

198.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

199.    The business entities owned and controlled by Defendant, Brown, are organized and operated as a mere tool or conduit for Brown's improper purposes. These entities, including,

but not limited to, SMI, the surgery centers, MGBIG, and MGBI, are used to fund Brown's extravagant lifestyle, by, among other things, by paying for personal expenditures and treating those expenditures as legitimate expenses of SMI, the Barrett PAs, and the surgical centers.

200.    Brown controls MGBIG and MGBI, and he has caused these companies to be used for the purposes of perpetrating, and did perpetrate actual fraud on Drs. Barrett, Singleton, and Ledesma, primarily for Brown's direct, personal benefit.

201.    Additionally, on information and belief, Brown has transferred or assigned a sizeable portion of his corporate empire to ProMed, LLC without receiving fair consideration for those transfers or assignments and did so for the purpose of defrauding Drs. Barrett, Singleton, and Ledesma.

202.    Allowing Brown to hide behind these entities would work an injustice because, on information and belief, not only has Brown begun to funnel the assets of MGBIG and MGBI to other related entities, such as ProMed, LLC, he also, on information and belief, has rendered MGBIG, MGBI, the "Brown Partners" entities, the "Brown Executive Partners" entities, the "Brown Employees Group" entities, and the "Brown Surgical Investments" entities insolvent and worthless in order to avoid their obligations to their respective members, such as Drs. Barrett, Singleton, and Ledesma. As such, the Court should pierce the corporate veils and hold Brown individually liable for the damages owed by the business entities, owned and controlled by Brown, to the Plaintiffs.

## J.    Fraudulent Transfers

203.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

204.    Brown, MGBIG, and MGBI have used the various business entities as a mechanism to wrongfully transfer assets, a portion of which rightfully belongs to the Plaintiffs into Brown's hands in violation of the Uniform Fraudulent Transfer Act as codified in Chapter 24 of the Texas Business and Commerce Code. Additionally, on information and belief, Brown has transferred, assigned, or attempted to transfer or assign, a sizeable portion of his corporate empire to ProMed, LLC without receiving fair consideration for those transfers or assignments and did so for the purpose of defrauding Drs. Barrett, Singleton, and Ledesma.

205.    These actions were done in order to delay, hinder, and/or defraud Drs. Barrett, Singleton, and Ledesma. As a result, the Plaintiffs have suffered actual damages that exceed the minimum jurisdictional limits of this Court.

## K.  Accounting

206.    The factual allegations above are incorporated herein for all purposes as if fully set forth at length.

207.    The interrelated web of business entities controlled by Brown that have siphoned off monies from the Barrett PAs and the surgical centers without any sort of accounting or disclosure to the equity holders in the various entities, including Drs. Barrett, Singleton, and Ledesma. Moreover, while such conduct was occurring, the Plaintiffs never received even the basic information needed to prepare tax returns.

208.    Accordingly, the Plaintiffs demand a full accounting from the entity Defendants, including but not limited to defendant ProMed, LLC, showing all revenues, expenses, and cash flows from each of the interrelated entities.

L.   **Demand for Immediate Access to Financial Records**

209.    The Management Services Agreements (at Section 8.3) provide that the Barrett

PAs and Dr. Barrett, as the Barrett Foot & Ankle Centers' designee, have access to all financial

records for the Barrett Foot & Ankle Centers and SMI which pertain to the operation of the Bar-

rett Foot & Ankle Centers' medical practices:

> During the term of this Agreement, and thereafter, [the Barrett Foot & Ankle
> Centers] or [their] designee shall have reasonable access during normal business
> hours to [the Barrett Foot & Ankle Centers] and [SMI's] financial records, which
> relate to the operation of [the Barrett Foot & Ankle Centers], including, but not
> limited to, records of collections, expenses and disbursements as kept by [SMI] in
> performing [SMI's] obligations under this Agreement, and [the Barrett Foot &
> Ankle Centers] may copy at [their] expense any or all of such records.

210.    Dr. Barrett and the Barrett Foot and & Ankle Centers invoke their right under

Section 8.3 of the Management Services Agreements and demand immediate access to and the

opportunity to inspect and copy all records of collections, expenses and disbursements kept by

SMI in the performance of its obligations under the Management Services Agreements. These

documents include, but are not limited to, tax returns and annual financial statements.

# VI.

## Exemplary Damages

211.    Plaintiffs' injuries proximately caused by the Defendants' tortious interference

with Plaintiffs' contracts, fraud, breaches of fiduciary duties, and/or civil conspiracy resulted

from Defendants' actual fraud or malice, and Defendants' outrageous, malicious, and morally

culpable conduct is the sort that exemplary damages are designed to punish. Accordingly, Plain-

tiffs are entitled to recover exemplary damages from Defendants.

## VII.

### Conditions Precedent

212.    All conditions precedent to Plaintiffs' right to recover against Defendants have been met, satisfied, or waived.

## VIII.

### Attorneys' Fees

213.    Plaintiffs were required to engage attorneys to represent them in the preparation, trial and appeal, if necessary, of this proceeding, and bring this suit for recovery of their attorneys' fees, expenses, and all other costs as provided in the Franchise Agreements and the Management Services Agreements, as well as pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

214.    In response to counterclaims asserted against the Plaintiffs, the contracts which form the basis of the counter-claims brought by the Defendants/Counter-Plaintiffs allow for the prevailing party in any litigation brought to enforce or interpret the contracts to recover their reasonable and necessary attorneys' fees. In the likely event the Plaintiffs/Counter-Defendants prevail in defending such claims, the Plaintiffs/Counter-Defendants respectfully request that the Court award them their reasonable and necessary attorney's fees as allowed by the contract.

## IX.

### Demand for Jury

215.    Plaintiffs demand a jury trial, and they tendered the appropriate fee to the Clerk with their Original Petition.

## X.

### Prayer

216.    WHEREFORE, premises considered, Plaintiffs, Stephen Barrett; Stephen Barrett DPM, PA; Stephen Barrett DPM, Austin, PA; Stephen Barrett, DPM, DFW, PA; Stephen Barrett, DPM, San Antonio, PA; Barrett Foot & Ankle Centers, Las Vegas, P.C.; Barrett Foot & Ankle, P.C.; Charles Singleton; and Paul V. Ledesma, respectfully request that after a trial on the merits, the Court enter judgment against the Defendants and award the Plaintiffs their actual damages, exemplary damages, reasonable and necessary attorneys' fees, pre- and post-judgment interest at the maximum legal rate, costs of Court, and all such further legal and equitable relief which they are justly entitled.

Respectfully Submitted,

PENDERGRAFT & SIMON, LLP

By: Robert L. Pendergraft
Texas Bar No. 15743500
William P. Haddock
Texas Bar No. 00793875
2777 Allen Parkway, Suite 800
Houston, TX 77019
Tel. (713) 868-3505
Fax. (713) 868-1267

*Counsel for Stephen Barrett; Stephen Barrett DPM, PA; Stephen Barrett DPM, Austin, PA; Stephen Barrett, DPM, DFW, PA; Stephen Barrett, DPM, San Antonio, PA; Barrett Foot & Ankle Centers, Las Vegas, P.C.; Barrett Foot & Ankle, P.C.; Charles Singleton; and Paul V. Ledesma*

## Certificate of Service

I hereby certify that a true and correct copy of the above Plaintiffs' Fourth Amended Petition has been served on the following counsel/parties of record pursuant to TEX. R. CIV. P. 21a and local rules for electronic filing and service on this 12th day of September 2012:

Mary-Olga Lovett
Greenberg Traurig, LLP
1000 Louisiana, Suite 1700
Houston, TX 77002
Fax: 713-374-3505

Paul Simon
Simon, Herbert, McClelland & Stiles, LLP
3411 Richmond, Suite 400
Houston, TX 77046
Fax: 713-987-7120

Clinton E. Wells
McDowell Wells, LLP
603 Avondale
Houston, TX 77006
Fax: 713-655-7868

William P. Haddock

CAUSE NO. 2012-07519

| | | |
|---|---|---|
| STEPHEN BARRETT, STEPHEN BARRETT DPM, PA, STEPHEN BARRETT DPM, AUSTIN, PA, STEPHEN BARRETT DPM, DFW, PA, STEPHEN BARRETT DPM, SAN ANTONIO, PA, BARRETT FOOT & ANKLE, P.C., PETER BREGMAN, CHARLES SINGLETON, GARY L. CRAMER, and PAUL V. LEDESMA, | § § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| V. | § § | HARRIS COUNTY, T E X A S |
| BROWN MEDICAL CENTER, INC. F/K/A SURGEON'S MANAGEMENT, INC., BHCF, LLC, and MICHAEL G. BROWN, | § § § § § | |
| Defendants, | § § | |
| V. | § § | |
| MANUEL GUYOT, BARRETT FOOT AND ANKLE CENTER, PHOENIX, LLC, CHARLENE McCULLAR, and AMELIA NAJERA, | § § § § § | |
| Third-Party Defendants, and Counter-Plaintiffs, | § § § | |
| V. | § § | |
| BROWN EXECUTIVE PARTNERS, AUSTIN, L.L.C., BROWN EXECUTIVE PARTNERS, DFW, L.L.C., BROWN EXECUTIVE PARTNERS, LAS VEGAS, L.L.C., BROWN EXECUTIVE PARTNERS, SAN ANTONIO, L.L.C., AND BROWN EXECUTIVE PARTNERS, SCOTTSDALE, L.L.C., | § § § § § § § § § § | |
| Third-Party Defendants. | § | 333rd   JUDICIAL   DISTRICT |

## DOCKET CONTROL ORDER

FILED
Chris Daniel
District Clerk
MAY 2 5 2012
Harris County, Texas
Time: _____
By _____ Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

The following docket control order shall apply to this case unless modified by the Court. If no date is given below, the item is governed by the Texas Rules of Civil Procedure.

1.      11-27-2012      **JOINDER.** All parties must be added, whether by amendment or third party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE.

2.      05-27-2013      **EXPERTS.** All parties seeking affirmative relief shall file their designation of experts for any affirmative relief they seek by this date; responsive designations are due 30 days after this date.

3.                        **STATUS CONFERENCE.** Parties shall be prepared to discuss all aspects of the case, including ADR, with the court on this date. TIME: _____
Failure to appear will be grounds for dismissal for want of prosecution.

4.                        **DISCOVERY LIMITATIONS.** The discovery limitations of Rule 190.2, if applicable, or otherwise, Rule 190.3 apply unless changed below.

      (a)              Total number per side for oral depositions.

      (b)              Number of interrogatories that may be served by each party on any other party.

5.      (a) 06-24-2013      **ALTERNATIVE DISPUTE RESOLUTION.** By this date, the parties must either (1) file an agreement for ADR stating the form of ADR requested and the name of an agreed mediator, if applicable; or (2) set an objection to ADR. If no agreement or objection is filed, the court may sign an ADR order.

      (b) 09-09-2013      ADR conducted pursuant to the agreement of the parties must be completed by this date.

6.      08-23-2013      **DISCOVERY PERIOD ENDS.** All discovery must be conducted before the end of the discovery period. Parties seeking discovery must serve requests sufficiently far in advance of the end of the discovery period that the deadline for responding will be within the discovery period. Counsel may conduct discovery beyond this period by agreement.

7.      06-24-2013      **DISPOSITIVE MOTIONS AND PLEAS.** Must be heard by oral hearing or submission except that Rule 166a(i) motions may not be heard before this date.

8.      08-23-2013      **CHALLENGES TO EXPERT TESTIMONY.** All motions to exclude expert testimony and evidentiary challenges to expert testimony must be filed by this date, unless extended by leave of court.

9.      08-23-2013      **PLEADINGS.** All amendments and supplements must be filed by this date. This order does not preclude prompt filing of pleadings directly responsive to any timely filed pleadings.

10.     09-25-2013      **TRIAL** at 9:00 A.M.

      SIGNED on    5/25/12     , 2012.

                          _____

                          JUDGE PRESIDING

- 2 -